**In re John C. DEVINE, Betty J. Devine.**

**Bankruptcy No. 90–00088–H4–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Sept. 23, 1991.

Carolyn A. Taylor, Houston, Tex., for debtors.

### CORRECTED OPINION

WILLIAM R. GREENDYKE,
Bankruptcy Judge.

Pursuant to Fed.R.Civ.P. 60(a), in order to correct a clerical error in the Opinion (Docket No. 122), the court substitutes its

---

Corrected Opinion. This matter came on for hearing on the amended motion of the United States of America ("IRS"), a creditor, seeking to Dismiss Debtors' Petition for Bad Faith filing. A hearing was held on January 23, 1991. Pursuant to Bankruptcy Rule 7052, the following constitutes the court's findings and conclusions. To the extent any purported findings would be more properly characterized as conclusions, they should be considered as such; to the extent that any purported conclusions are in fact better characterized as findings, they should be considered as such.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

The debtors, John C. Devine and Betty J. Devine, filed their voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 4, 1990. IRS filed its Motion to Dismiss on May 24, 1990, and amended its motion on May 29, 1990. Debtors filed responses to both motions. On June 8, 1990 the United States Trustee filed a motion in support of the IRS' position. The court set a hearing on August 30, 1990. After numerous continuances, a hearing on the merits of the amended Motion to Dismiss was held on January 23, 1991, following which this matter was taken under advisement. At the time of the hearing no plan of reorganization or disclosure statement had been filed.

Debtor, John C. Devine, is a licensed medical doctor practicing in the area of obstetrics (Debtors' Exhibit 1 at p. 1). He is employed by John C. Devine M.D., P.A., an entity created on or about December 1, 1975. The Debtors' financial statements do not list any income produced by Dr. Devine's spouse, Betty J. Devine. Debtors intend to fund their reorganization from two sources: 1) income from Dr. Devine's medical practice which he estimates on his schedules to be $13,447.93 per month after taxes; and 2) income from a Pension Plan in the name of John C. Devine M.D., P.A. Retirement Plan and Trust. ("Pension Plan"). Debtors listed the Pension Plan as exempt property with a value of $878,-505.18 as of November 30, 1989. Debtors have no other income producing assets. Dr. Devine testified that in 1976 he set up the Pension Plan to have retroactive effect beginning in 1975. The parties stipulated that between 1976 and 1986, Debtors contributed $562,991.88 to the Pension Plan. The Debtors made no contributions to the Pension Plan in 1987 or 1988, and at the date of filing of the petition the plan had grown to $878,508.18 with the addition of accrued interest. The IRS filed an objection to Debtors' proposed exemption of the pension plan (docket # 11). Debtors responded and ultimately the objection was consolidated by order of this court on June 27, 1990 with adversary number 90–0030, Debtors' Complaint to Determine Dischargeability of Certain Tax Debts. I abated both matters *sua sponte* on September 19, 1990 pending a determination on the Motion to Dismiss.

Dr. Devine borrowed approximately $50,-000.00 from the Pension Plan pre-petition and signed a promissory note in consideration for the loan. $27,000.00 of the loan proceeds were used by Dr. Devine to purchase a 1988 Sterling automobile. Title to the Sterling is held by Dr. Devine, individually. Dr. Devine's testimony and bankruptcy schedules indicate that he holds the Sterling for the benefit of John C. Devine, M.D., P.A. Dr. Devine uses the vehicle for business and personal use. The Professional Association takes the depreciation on the vehicle. The remaining $23,000.00 in loan proceeds were used by Debtors to pay income taxes.

At the hearing on the motion to dismiss, Dr. Devine testified that in approximately 1983, he created an irrevocable trust for the benefit of his children (the "Children's Trust") and conveyed various parcels of real property to the Trust. The purpose of the Children's Trust was to make Dr. Devine as judgment proof as possible in his medical practice. The Children's Trust had no income and the properties were deeded to the Children's Trust without monetary consideration. Two of the properties included in the transfers were Debtors' residence in Pasadena, Texas, and a property located on Lake Conroe in Huntsville, Tex-

as. The properties are described more fully in Debtors' addendum to their Schedule B filed on or about January 4, 1990. Debtors claim life estate interests in both properties; however, documents evidencing the retained interest have never been recorded of public record. Debtors continue to reside at the Pasadena address and to use the property at Lake Conroe.

Dr. Devine further testified that he was a defendant in four malpractice lawsuits which are listed on his second amended Schedule A-3 (Debtors' Exhibit 3). Of the four claimants in existence as of the date of petition, Dr. Devine testified that the suits by claimants designated as "Cardenas" and "Grau" were no longer active as of the petition date. The suits were filed in 1978 and 1983 respectively during an approximately eight-year period while Dr. Devine did not maintain malpractice insurance coverage. The other two suits by claimants designated as "Bouffanie" and "Murdock" were filed in 1989, or were at least in existence as of the date of petition. The Bouffanie claim settled in November of 1990, while the Murdock litigation is still active.

Dr. Devine testified that he received tax refunds for the tax years of 1972–1975. Debtors stipulated that no taxes were paid and no withholding occurred for the tax years 1976 through 1981. During each of the tax years between 1976–1981 Debtors had income of over $100,000.00 per year.

Debtors received an IRS Notice of Deficiency for the tax years 1972 through 1976. After petitioning for redetermination (IRS Exhibit 16) the Debtors executed an agreed stipulation of tax liability entered in the form of a decision of the United States Tax Court on March 17, 1989 (IRS Exhibit 17). The IRS filed a proof of claim in the amount of $1,106,946.82. (IRS Exhibit 10). The parties stipulated that the IRS assessed taxes for the years 1975–1982 on May 8, 1989 in the approximate amount of $850,000.00 as evidenced by the IRS proof of claim. The parties further stipulated that the IRS assessed taxes for the years 1972–1974 on May 29, 1989 in the approximate amount of $250,000.00 as evidenced by IRS Exhibit 10.

Debtors filed bankruptcy on the 241st day after the May 8, 1989 assessment and assert that the tax assessment for the years 1975–1982 is dischargeable pursuant to 11 U.S.C. §§ 507 and 523. Debtors filed adversary proceeding number 90–0030 related to the issue of whether their tax liability is dischargeable. At the hearing on the motion to dismiss, I took judicial notice of the Debtors' complaint in adversary number 90–0030 in which the Debtors claim that the taxes assessed for the years 1975–1982 are dischargeable.

Debtors' Budget of Current Expenditures included in Debtors' statement of financial affairs estimates Debtors' monthly expenses to be $10,060.13. The budget included monthly expenses of $1,250.00 for "vacations", $1,000.00 for "Christmas", $1,000.00 for "entertainment", $500.00 for "clothing", $2000.00 in "legal fees", $160.00 for "utilities at Lake House", and $185.00 for "lawn services".

In the United States of America's Amended Motion to Dismiss Debtors' Petition for Bad Faith (docket # 38), the IRS alleges that Debtors did not file their petition in good faith as Debtors have no honest intention, ability or need to reorganize. The IRS also claims that Debtors' petition abuses the bankruptcy process because Debtors filed their bankruptcy merely to avoid an unfavorable decision by the Tax Court. On these grounds, the IRS urges this court to dismiss Debtors' case for cause pursuant to 11 U.S.C. § 1112(b). As indicia of bad faith, the IRS emphasizes the following: 1) Debtors' lack of significant assets other than their Pension Plan; 2) Debtors' excessive personal expenditures; 3) Debtors' failure to designate the Sterling automobile as personal property in their schedules; 4) the timing of Debtors' bankruptcy filing on the 241st day following the IRS' assessment of taxes liabilities for the years 1975 through 1982; and 5) the Debtors' pre-petition transfer of property to the Children's Trust to shelter assets of Debtors while maintaining life estates constituting "secret liens".

■ Section 1112(b) of the Bankruptcy Code contains a non-exhaustive list of occurrences which may constitute cause for dismissal or conversion of a Chapter 11 case. The phrase "for cause" is not defined by the statute to allow the bankruptcy court flexibility in determining whether or not a case was filed in good faith. *In re Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir.1986). Findings of lack of good faith are based on an overall review of the circumstances on a case by case basis. *Id.* at 1072. Neither the "for cause" factors enumerated in 11 U.S.C. § 1112(b) nor the factors contained in *Little Creek* are exhaustive and the court may use its equitable powers to consider each individual case. H.R.Rep. No. 595, 95 Cong., 1st Sess. 405–406 (1977), U.S.Code Cong. & Admin.News 1978, 5787; *Little Creek*, 779 F.2d at 1072–1073.

■ Applying these factors to the evidence presented in the instant case, I do not find that debtors filed their petition in bad faith. First, the Debtors have two sources of income from which to fund a plan of reorganization: 1) income from Debtors' Pension Plan and 2) Dr. Devine's estimated net monthly income of $13,447.93 from his medical practice. Although Debtors have few creditors, the estimated amounts of their claims are substantial. Debtors' transfer of property to the Children's Trust in 1973, seven years prior to the filing of Debtors' petition, does not demonstrate bad faith. Similarly, Debtors' creation of a Pension Plan in 1976, approximately 14 years before filing for bankruptcy protection does not evidence bad faith. Moreover, there is no evidence that Debtors have made any contributions to the Pension Plan since 1986. Debtors' listing of the 1988 Sterling automobile on their schedules as property held for the benefit of Dr. Devine's Professional Association may be incorrect, but does not amount to cause for dismissal. Finally, the fact that Debtors waited 241 days after the IRS assessed tax liability to file their petition is not determinative of the issue, especially since the IRS had the opportunity to file tax liens throughout the 241 day period and neglected to do so.

The evidence presented in this case, when all circumstances are considered, does not amount to cause for dismissal.

In applying my equitable powers to consider the application of § 1112(b) to each case on an independent basis, I observe that individuals filing for Chapter 11 relief face somewhat different circumstances than business entities filing for Chapter 11 relief. As an initial matter, I note the United States Supreme Court's recent decision which held that individual debtors not engaged in business may file for Chapter 11 relief. *Toibb v. Radloff,* —— U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). While finding that the Bankruptcy Code contains no "ongoing business" requirement for Chapter 11 eligibility, the Supreme Court stated, ... "Chapter 11 also embodies the general Code policy of maximizing the value of the bankruptcy estate." *Toibb*, at ——, 111 S.Ct. at 2201.

In the present case, Dr. Devine is a consumer debtor who derives his income from his medical practice. Dr. Devine and his spouse are ineligible for relief under Chapter 13 of the Bankruptcy Code because of the amount of debt listed in their bankruptcy schedules. 11 U.S.C. § 109(e). As such, the Debtors are not precluded from utilizing Chapter 11. Nevertheless, the standards and requirements of Chapter 11 must govern individual debtors with the same rigor with which they govern business debtors.

The Fifth Circuit Court of Appeals has addressed the duties of Chapter 11 debtor in his role as debtor-in-possession, noting that, "[a] debtor-in-possession, in his capacity as such, occupies the shoes of a trustee in every way." *Yellowhouse Machinery Co., v. Mack, (In re Hughes)*, 704 F.2d 820, 822 (5th Cir.1983). The debtor-in-possession is granted both the rights and the duties of a trustee. *Id.* at 822. The Fifth Circuit summarized the debtor's duties in his role as debtor in possession as follows: "[A] debtor in possession holds its powers in trust for the benefit of creditors. The creditors have the right to require the debtor in possession to exercise those powers

for their benefit." *Id.* at 822 (citing *Matter of E. Paul Kovacs & Co., Inc.* 16 B.R. 203, 205 (Bankr.D.Conn.1981)).

Indeed, in addressing issues related to legal representation of a Chapter 11 debtor in possession, courts have held that a debtor in possession has fiduciary responsibilities in dealing with property of the estate. *In re Kendavis Industries International, Inc.*, 91 B.R. 742, 757 (Bankr.N.D.Tex.1988) (citations omitted); *see also In re Hargis*, 73 B.R. 622, 626 (Bankr.N.D.Tex.1987).

Individual debtors in Chapter 11 may be faced with the inconsistent roles of acting both as a zealous representative of the estate and a champion of their own personal rights. The inconsistencies in these roles presents an inherent conflict for an individual debtor-in-possession. *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 576 (Bankr.N.D.Tex.1986). Conflicts may arise in regard to issues of exemptions, dischargeability, or confirmation issues, including hurdles posed by the Absolute Priority Rule. Indeed, without deciding the question, this court acknowledges that an Absolute Priority Rule question pursuant to § 1129(b)(2)(B)(ii) may arise when individual Chapter 11 debtors attempt to retain exempt property while more senior classes remain impaired. *Cf. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988).[1]

In the present case, Debtors are faced with inherent conflicts on issues regarding the exemption of their Pension Plan, the dischargeability of their tax liability, and their ability to propose a confirmable plan in the best interests of their creditors while retaining exempt property. Debtors' maintenance of their declaratory judgment action on the issue of dischargeability of their tax liability is a drain on the estate from which Debtors alone may benefit.[2] While the estate must bear the expense of Debtors' legal fees, no corresponding benefit is conferred on the estate in the event of a result favorable to debtor. Regardless of the outcome of the action, the estate will be subject to the claim. In fact, Debtors' dischargeability action may actually serve to delay administration of the estate. Debtors' position is squarely in conflict with the congressional purpose served by allowing individuals to file Chapter 11 cases—to derive as much value as possible from the debtors' estate. *See, Toibb v. Radloff,* —— U.S. ——, ——, 111 S.Ct. 2197, 2201–02, 115 L.Ed.2d 145 (1991). For similar reasons, Debtors' defense of the IRS' objection to their Pension Plan exemption is inconsistent with their fiduciary responsibility to increase the estate for the benefit of their creditors.

In analyzing whether Debtors are fulfilling their fiduciary duty in Chapter 11, I also find it appropriate to consider Debtors' budget and their post-petition expenditures. In doing so, I note the contrast between the freedom enjoyed by an individual Chapter 11 debtor and the constraints that would be placed on the same debtor in Chapter 13. Chapter 11 allows an individual debtor many privileges without a great deal of supervision. In contrast, the personal expenditures of a consumer debtor in Chapter 13 are monitored closely by a trustee. In Chapter 13 a debtor's budget and plan are subject to strict scrutiny at a very early stage in the case. The Chapter 13 trustee continues to monitor the debtor's compliance with the budget and plan, both before and after confirmation. None of these safeguards are present in Chapter 11 where an individual debtor is allowed great freedom to manage his own personal expenditures. To balance this discrepancy the Code assigns a Chapter 11 debtor-in-possession the fiduciary rights and duties of a trustee. 11 U.S.C. § 1107(a). When the debtor-in-possession fails to fulfill his

---

**1.** The legislative history of § 1129(b)(2)(B)(ii) also addresses a debtor's retention of property, stating "... if the class is impaired, then they must be paid in full or, if paid less than in full, then no class junior may receive anything under the plan." H.R.Rep. No. 595, 95th Cong.2d Sess. 413, reprinted in 1978 U.S.Code Congressional and Administrative News 5963, 6369.

**2.** No evidence was presented nor any argument made as to any allocation of legal expense to non-estate sources of funds.

duties, § 1104(a)(2) provides that the court shall order the appointment of a trustee.

Upon initial review of Debtors' Budget of Current Expenditures, the IRS' objections to the Budget seemed unfounded in light of Debtors' testimony concerning their reduction in post-petition living expenses. Debtors' monthly Operating Reports for January through December, 1990 were introduced into evidence as Debtors' Exhibits 4–15. Upon careful inspection of the Operating Reports I find the IRS' objections to be not only well-founded, but understated. Although Debtor's living expenses dropped during the first quarter of 1990, the same expenses increased sharply as the year progressed. Attached as Exhibit A to this opinion is a chart summarizing portions of Debtors' Operating Reports for 1990. The chart tracks Debtors' total monthly cash disbursements as well as specific expenditures for food, supplies, and "other" expenses. While Debtors spent $1,500.00 for food in the entire first quarter of 1990, by May of 1990 Debtors were regularly spending $1,500.00 *per month* on food. In fact, after April, 1990 Debtors spent at least $1,000.00 per month on food, presumably for Debtor and his wife alone.[3] Moreover, expenditures for food are documented only by a series of checks written for cash in increments of $500.00.

Similarly, Debtors' Operating Reports evidence large expenditures for "supplies" which are primarily supported only by checks written for "cash" or "miscellaneous household expenses". The expenditures for supplies alone was $1,000.00 in October, 1990 and $500.00 per month in November and December, 1990. I can find no explanation for the use of these funds other than checks written to "cash—misc. Household Expense" in sums of $500.00 per check.

I also question Debtors' expenditures in the category designated "other". Overall, Debtors provided little or no justification for "other" expenses. In April, 1990 Debtors included almost $1,000.00 in other ex-

penses. Although no explanation is provided, Debtors' check record attached to their April Operating Report shows a check cashed for $1,000.00 designated as "vacation". In addition, Debtors earmarked $2,095.44 for other expenses in August, 1990 without providing any explanation at all. In October and November, 1990 Debtors paid approximately $5,000.00 per month to their attorneys, which was apparently included in the "other" expenses category.

In the course of 1990, Debtors presumably paid $1,203.00 to W.D. Ramey for lawn maintenance, $935.17 in florist's bills and $2,049.94 to Sears, including $1,531.53 for a new lawn mower and $440.12 for appliance maintenance. Between November and December, 1990 Debtors spent the sum of $4,500.00 for Christmas gifts.

Debtors' undocumented and unbridled use of cash is precisely the type of abusive behavior which cries out for the appointment of a trustee. A consumer debtor who chooses to reorganize in Chapter 13 must do so under the watchful eye of a trustee. Although Debtors who exceed the financial requirements of Chapter 13 may reorganize in Chapter 11 without the safeguards of a trustee, they must fulfill the rights and duties of a trustee in protecting and enhancing the estate. In this case, Debtors have failed to fulfill this responsibility.

■ I have previously noted the questionable nature of Debtors' monthly expenditures and the inherent conflicts faced by Debtors in carrying out their fiduciary responsibilities as debtors-in-possession. These factors must be included in my analysis of whether or not this Chapter 11 case is progressing in accordance with the Code and is being handled properly. Based upon these findings and conclusions, I am issuing by separate order in conjunction with this memorandum opinion, an order requiring Debtors to show cause why this case should not be converted to Chapter 7, or why a Chapter 11 trustee should not be appointed. The IRS' amended motion to dismiss will be denied.

---

**3.** Dr. Devine testified that he and his wife are both 55 years old. Although Dr. Devine testified that he transferred property to his Children's Trust there was no reference to dependent children still residing in Debtors' household.

EXHIBIT A

EXHIBIT "A"

| 1990 | Food | Supplies | "Other" | Total Cash Disbursements | Checks Written for Cash |
|---|---|---|---|---|---|
| January | 0 | 0 | $54.44 | $2,486.40 | none |
| February | $600.00 | $122.52 | 0 | $4,388.68 | $600.00 ($300. x 2) |
| March | $900.00 | $357.96 | 0 | $3,296.00 | $1,200.00 ($300. x 4) |
| April | $600.00 | $19.44 | $974.69 | $5,083.10 | $600.00 ($300. x 4) $1,000 ("vacation") |
| May | $1,500.00 | $653.29 | 0 | $4,207.82 | $2,000.00 ($500. x 4) |
| June | $1,500.00 | $519.44 | 0 | $4,550.87 | $2,000.00 ($500. x 4) |
| July | $1,500.00 | $270.00 | $156.79 | $8,879.54[2] | $2,000.00 ($500. x 4) |
| August | $1,000.00 | 0 | $2,095.44 | $6,107.67 | no documentation of expenses |
| September | approx. $1,000.00 | 0 | $3,110.87 | $6,768.09 | $2,000.00 ($500. x 4) |
| October | $1,500.00 | $1,000.00 | $5,371.78[3] | $12,052.98 | $2,500.00 ($500. x 5) |
| November | $1,000.00 | $500.00 | $5,165.21[4] | $10,019.24 | $2,500.00 (misc. household & $1,500.00 for Christmas |
| December | $1,500.00 | $500.00 | $577.37 | $7,778.71 | $5,000.00 (misc. household & $3,000.00 for Christmas |

[1] It is apparent that to a certain extent some checks written for cash were used for other line items such as food and supplies.

[2] Includes $3,000.00 medical expense

[3] "Other" Expenses include $5,000.00 attorneys' fees paid to Urban & Coolidge and $316.00 paid to a court reporting service.

[4] "Other" expenses include $4,966.67 attorneys' fees deposited into trust account of Urban & Coolidge.