**In re Robert B. HARMAN, Leanna J. Harman a/k/a Leanna J. Hohannes, Debtors.**

**Bankruptcy No. 91–15053S.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 2, 1992.

**880**

Michael Temin, Liza B. Leidner, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for debtor.

Richard E. Lubarsky, and Howard B. Lebi, Kornstein Veisz & Wexler, New York City, for creditors' committee.

John F. Gehring, Becket & Watkins, Malvern, Pa., for Chemical Bank, Manufacturers Hanover Bank and CoreStates Bank of Delaware.

Leo F. Doyle, Jr., Doyle, Whelan & Doyle, Upper Darby, Pa., for CoreStates Bank.

Marcy N. Hart, Klehr, Harrison, Harvey, Branzburg & Ellers, Cherry Hill, N.J., for Fidelity Bank.

Ben Burke Howell, Reed Smith Shaw & McClay, Philadelphia, Pa., for Pitcairn Private Bank.

Pauline K. Morgan, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for Citibank, N.A.

William T. Freyvogel, McLean, Va., for Continental Federal Sav. Bank.

C. Paul Scheuritzel, Toll, Ebby, Langer & Marvin, Philadelphia, Pa., for Morgan Guar. Trust Co. of N.Y.

Natalie Ramsey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for Palmer Nat. Bank.

Gary A. Rosen, Hangley Connolly Epstein, Chicco Foxman & Ewing, Philadelphia, Pa., for McKinsey & Co.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The issue presented in the instant individual joint Chapter 11 case is whether and in what circumstances consumer debtors can "cram down" confirmation of a plan rejected by unsecured creditors pursuant to 11 U.S.C. §§ 1129(b)(1), (b)(2)(B). We conclude that consumer debtors can utilize the "new value exception" to overcome the "absolute priority rule" in only a narrow set of circumstances, and that the debtors' fiduciary duty to provide "fair and equitable" treatment to unsecured creditors is heightened in such a "cramdown" situation.

In the instant factual setting, we find that the Debtors' personal expenses under their proposed budget are too lavish to constitute "fair and equitable" treatment to unsecured creditors. We also find that a plan provision which triggers payments only upon the Debtors' sale of a certain property is illusory and must be phrased in mandatory terms to be meaningful. Therefore, we will deny confirmation of the instant plan, although we will allow the Debtors at least one more chance to propose a plan which is confirmable.

## B. PROCEDURAL AND FACTUAL HISTORY

ROBERT B. HARMAN ("the Husband") and LEANNA J. HARMAN ("the Wife") (collectively "the Debtors") filed the underlying individual joint bankruptcy case under Chapter 11 of the Bankruptcy Code on September 20, 1991. Several creditors have filed complaints challenging the Debtors' discharge and/or the dischargeability of their particular respective debts, but none of these matters have proceeded to trial, apparently having been settled.

On January 17, 1992, the Debtors filed a Plan of Reorganization. This Plan, as modified on two occasions to memorialize agreements regarding treatment of certain secured creditors, on February 14, 1992, and March 20, 1992 ("the Plan"), is before us for confirmation.

An Amended Disclosure Statement was approved by this court on March 31, 1992. Several large creditors, Citibank, N.A.; Morgan Guaranty Trust Co.; and in a joint submission, Chemical Bank, Manufacturers Hanover Bank, and CoreStates Bank of Delaware (all of these objecting creditors are referred to collectively as "the Banks"), filed Objections to confirmation. A confirmation hearing was scheduled on May 20, 1992, and continued by agreement to May 27, 1992. The Banks requested a continuance of the confirmation hearing on May 27, 1992, claiming that they had only recently gained access to certain information relevant to the effectuation of the Plan. Granting this request, the hearing was ultimately continued to June 3, 1992. An Official Unsecured Creditors' Committee ("the Committee") was appointed on May 6, 1992, and counsel for the Committee filed an application for appointment on June 1, 1992, which we granted on June 3, 1992.

The Report of Plan Voting indicates that three out of five secured classes accepted the Plan, and the other two neither rejected it nor objected to it. However, only seven (7) out of seventeen (17) unsecured creditors, whose claims represented only 23.1 percent of the total amount of the claims voted, accepted the Plan. We will therefore focus solely on the Plan's treatment of the Debtors' unsecured creditors.

As to unsecured creditors, the Plan provides that each such creditor may select treatment under one of two options. Under Option A, a creditor would receive full payment over 30 years, with interest at the current prime rate, and with payments beginning on the Plan's effective date. Under Option B, a creditor would receive a total of twenty-five (25%) percent of its claim, with fifteen (15%) percent to be paid within 60 days of the Plan's effective date, and the remaining ten (10%) percent to be paid without interest over two years, beginning 30 days after the sale of one of the Debtors' two residences. The Debtors were also obliged to make a balloon payment at the end of year two to pay the remaining portion of the second-step ten (10%) percent payments. All but one of unsecured creditors selected, or were deemed upon the failure to make a selection, by the terms of the Plan, to have selected Option B.

The Debtors have stated that they are retaining approximately $166,000 in nonexempt property, most of which is included in a bank account, and are funding the payments under the Plan from the following sources:

1. The liquidation of the Husband's retirement account with a former employer, Peat Marwick, Inc., in the gross amount of $63,071.21;

2. A loan taken out against the Husband's 401(k) Plan with McKinsey and Company ("McKinsey"), where he is presently employed but contemplates leaving shortly, in the amount of $31,000;

3. The liquidation of the remaining amounts contained in the Husband's 401(k) Plan, available as of September 30, 1991, in the gross amount of $30,000;

4. The Husband's additional compensation paid by McKinsey post-petition, in the amount of $40,737.57; and

5. Monthly Plan payments from the Husband's anticipated post-confirmation compensation in the approximate amount of $140,000.

The Committee and the Banks (collectively "the Objectors") alleged that the Plan was not feasible, as it contemplated funding from the Husband's salary, and the Husband was to leave his employment with McKinsey on about June 30, 1992, with no solid prospect for re-employment. On the other hand, the Objectors also contended that, even if the Husband in fact retained employment at or near his historical rate of compensation, then more payments to them were needed to render the Plan "fair and equitable" as to them. They were particularly troubled by the fact that the payment of the last ten (10%) percent of their twenty-five (25%) percent dividend was triggered only by the Debtors' sale of one of two residences, and that there was no deadline on when such a sale must occur.

The Debtors submitted a pre-hearing Memorandum, arguing principally that the Plan met the low threshold for feasibility and that the application of the "new value exception" to the "absolute priority rule" rendered the Plan "fair and equitable" to all creditors.

The Husband was the sole witness at the hearing of June 3, 1992. Also admitted into the record were the Debtors' Statement of Financial Affairs and Schedules ("the Schedules"). The following facts are gleaned from these two sources.

The Debtor has been employed for several years by McKinsey as a business management consultant. His compensation is $460,000 annually. In late, 1991, he was requested by McKinsey to relocate to Caracas, Venezuela. The Debtor declined this assignment. McKinsey apparently had no long-term needs for the Debtor elsewhere. The Debtor then chose to resign. McKinsey and the Debtor agreed that the Debtor could remain at McKinsey until June 30, 1992, while he attempted to obtain suitable alternative employment.

The Debtor stated that he was currently weighing offers from a company in Florida at compensation of $400,000 annually, and from a company in California at compensation of $460,000 annually. He also expressed confidence that McKinsey would allow him to stay on at the same salary after July 1, 1992, while he weighed these offers.

The Schedules list two personal residences, one at 700 St. Andrew's Road, Philadelphia, Pennsylvania, valued at $650,000, and subject to a $570,000 mortgage; and the other at 84 Pine Ranch Road, Rehoboth, Delaware, valued at $500,000, and subject to a mortgage of $500,000. The Wife is unemployed, and apparently remains at home to care for the Debtors' two young children. The Husband stated that both properties are on the market, but that he would prefer selling the Philadelphia property, because he has equity in that home which could be realized in a sale and because the cost of maintenance of this home was greater than that of the Delaware home.

The Debtors' indebtednesses include unsecured debts of $1,279,599.45. No explanation was provided as to how such extensive debt was accumulated when the Debtors have such a large income.

The Husband presented, at the hearing, an update of the Debtors' statement of most of their current monthly expenditures included with their Schedules. Monthly mortgage payments, the only item not updated, were said to total $11,100. The updated other expenses, before and after the projected sale of the Philadelphia property, are as follow:

|  | PRIOR TO SALE OF PHILA. PROP. | AFTER SALE OF PHILA. PROP. |
|---|---|---|
| Real Estate Taxes | $ 825.00 | $ 166.00 |
| Electricity and Oil | 640.00 | 440.00 |
| Water and Sewer | 99.00 | 70.00 |
| Telephone | 250.00 | 250.00 |
| Other Utilities | 139.00 | 70.00 |
| Home Maintenance | 1,000.00 | 200.00 |
| Food | 450.00 | 450.00 |

| | PRIOR TO SALE OF PHILA. PROP. | AFTER SALE OF PHILA. PROP. |
|---|---|---|
| Clothing | $ 500.00 | $ 500.00 |
| Laundry, Dry Cleaning, and Maid Service | 400.00 | 400.00 |
| Medical and Dental | 150.00 | 150.00 |
| Transportation | 200.00 | 200.00 |
| Recreation, Clubs, Etc. | 500.00 | 500.00 |
| Charitable Contributions | 100.00 | 100.00 |
| Child care | 1,100.00 | 1,100.00 |
| Home Owners, Auto, Liability Insurance | 778.00 | 500.00 |
| Life Insurance | 410.00 | 410.00 |
| Health Insurance | 175.45 | 175.45 |
| Delaware State Income Taxes | 1,500.00 | 1,500.00 |
| Car Payments | 500.00 | 500.00 |
| Alimony and Support | 3,333.00 | 3,333.00 |
| Expense Total | $13,049.45 | $11,014.45 |

After the hearing, we entered an Order of June 4, 1992, allowing the parties opposing confirmation to submit Briefs on or before June 15, 1992, and those supporting confirmation to file Briefs on or before June 22, 1992. However, upon receipt of Briefs from the Objectors, finding that the current submissions had failed to address issues which we believed were relevant, we entered an Order of June 16, 1992, in which we stated that

the court believes that the following issues are significant to disposition of this matter and must be considered by the court in its independent review of the Plan, *see In re Richard Buick, Inc.,* 126 B.R. 840, 846 (Bankr.E.D.Pa.1991), [and] have not been addressed by the parties:

1. Does the "new value exception" to the "absolute priority rule" apply at all in an individual case? If so, what are the standards, since many of the "traditional" standards, *see In re 222 Liberty Associates,* 108 B.R. 971, 984 (Bankr.E.D.Pa.1990), reference "capital investment," which is difficult to conceptualize in the case of individuals. Is there *ever* a situation in which individual debtors can be said to need money as a "capital investment" in the sense that a *non-individual entity does?* Or could it be said that *all* plan payments by Chapter 11 individual debtors are "capital investments," such that *any* cash infusion in an individual case precludes application of the "absolute priority rule?" Examples of cases in

which these concepts were applied in individual cases would be appreciated.
2. Putting aside the "absolute priority rule" issue, what are the standards which individual debtors must satisfy to render their plan "fair and equitable" under 11 U.S.C. § 1129(b)(1) in the general sense? Is it not in consideration of this issue that the Debtors' budget is scrutinized, rather than in considering whether the Debtors have satisfied 11 U.S.C. § 1129(a)(3)? Examples of cases in which the general "fair and equitable" concept was applied in individual cases would also be appreciated.

The interested parties were all given the opportunity to file Supplemental Briefs addressing the foregoing issues on or before June 24, 1992.

## C. DISCUSSION

### 1. The Debtors' Plan Appears Feasible.

Since the class of unsecured creditors has rejected the Plan, the Debtors can achieve confirmation of the Plan only if they can satisfy the requirements of 11 U.S.C. §§ 1129(b)(1) and (b)(2)(B), which provide as follows:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan,

shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

.        .        .        .        .

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

The Objectors, in addition to contending that the foregoing requirements are not met, also claim that the Plan fails to meet the mandatory requirements set forth in the following sections of 11 U.S.C. § 1129(a):

(a) The court shall confirm a plan only if all of the following requirements are met:

.        .        .        .        .

(3) The plan has been proposed in good faith and not by any means forbidden by law.

.        .        .        .        .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

We are not very much troubled by the Debtors' satisfaction of the feasibility requirement set forth in 11 U.S.C. § 1129(a)(11). Speaking of the considerations which a bankruptcy court must make in determining plan feasibility in *In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 410–11 (Bankr.E.D.Pa.1991), we stated as follows:

The standards for determining plan feasibility are not rigorous. *See, e.g., In re Temple Zion*, 125 B.R. 910, 914–15 (Bankr.E.D.Pa.1991); *In re 222 Liberty Associates*, 108 B.R. 971, 985–86 (Bankr. E.D.Pa.1990); *In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr.E.D.Pa. 1989); and 5 COLLIER ON BANKRUPTCY, ¶ 1129.2(11), at 1129–36.11.

"Caselaw has established that bankruptcy court[s] must consider several factors in making a feasibility determination: (1) the adequacy of the debtor's capital structure; (2) the earning power of its business: (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *See, e.g., 222 Liberty Associates*, 108 B.R. at 986; *In re Gulph Woods Corp.*, 84 B.R. 961, 973 (Bankr.E.D.Pa.1988), *aff'd*, C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989); and *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980)."

*Temple Zion, supra*, 125 B.R. at 915.

Success of the Debtors' Plan is postulated on the Husband's future employment in a position in which he earns a figure approximating the $460,000 annual salary which he earns at McKinsey. Although other assets of the Debtors valued at approximately $164,000 will be contributed, *see* page 4 *supra*, ongoing employment and income is assumed.

We found no reason to doubt that the Husband will indeed continue to earn a salary in the $400,000 per annum range. We accept his unrebutted testimony that he can and will choose between two offers outstanding shortly, and will be able to remain at McKinsey until his employment transition can be accomplished. Although there is no apparent reason to doubt the

Husband's testimony on the record, since we cannot confirm the Plan in its present state, we will be able to test the accuracy of the Husband's predictions regarding his future employment status after July 1, 1992, in later proceedings in this case.

Adapting the criteria set forth above as to corporations to the individual Debtors, we believe that the Debtors' earning power is quite sufficient. Their "capital structure," which includes not only their present liquid assets, but also their ability to make additional savings, appears quite sound. In fact, as we note below at pages 888–890 *infra,* we find that it is, if anything, too sound. The Debtor's line of work does not appear particularly susceptible to vicissitudes in future economic conditions.

The ability of the Debtors to manage their financial affairs raises some doubt in our minds. As we noted earlier, it seems strange that individuals with such a large income would accumulate such large debts that they had to consider filing bankruptcy. However, since the Objectors did not focus on this issue, we rather assume that the Debtors suffered unanticipated and excusable reversals, perhaps in making investments. The Objectors' only concerns expressed at the hearing were whether the Husband would indeed remain employed and receive compensation similar to that which he received at McKinsey. Finding no reason to disbelieve the Husband on this point, we deem the Plan, at this point, feasible. Again, we note that, since we cannot confirm the present Plan, we will be likely to have an occasion to revisit this area prior to confirmation of an Amended Plan. At that time, we can determine just how accurate the Husband's predictions of lack of difficulties on this score were.

2. *The Application of the Absolute Priority Rule in a Chapter 11 Consumer Case is, at Best, Extremely Limited.*

We next turn our attention to the first issue which we asked the parties to consider in their submissions due on June 24, 1992: the applicability of the "new value exception" to the "absolute priority rule" in this context.

The "absolute priority rule" is embodied in 11 U.S.C. § 1129(b)(2)(B)(ii), quoted at pages 883–884 *supra.* It provides, simply, that, since the class of unsecured creditors rejected the Plan, the Debtors themselves, whose status is "junior" to that of unsecured creditors, may not retain any non-exempt property under the Plan unless they pay the unsecured creditors in full. The Debtors admit that they plan to retain about $166,000 worth of non-exempt property after confirmation of the Plan. Therefore, the "absolute priority rule" becomes a significant factor in the instant confirmation process.

The Debtors appear to attempt to sidestep the rule by arguing that, in Option A of the Plan, *see* page 881 *supra,* they have satisfied 11 U.S.C. § 1129(b)(2)(B)(i) by providing their unsecured creditors with an opportunity to receive or retain the full allowed amount of their claims. However, we do not consider this requirement fulfilled by a plan which suspends satisfaction of the claims in issue for as long a term as 30 years. Therefore, the Debtors must satisfy the requirement of § 1129(b)(2)(B)(ii) if the Plan is to be confirmed.

The Debtors rely heavily upon the contention that the "new capital contribution exception" or "new value exception" to the absolute priority rule is applicable. *See In re 222 Liberty Associates,* 108 B.R. 971, 983–85 (Bankr.E.D.Pa.1990). We agree, for the reasons recited in that Opinion, that the new value exception generally retains vitality in Chapter 11 business cases. However, any application of the new value exception must meet the requirements that (1) the payment of new value is substantial; and (2) the payment equals or exceeds the value of the property interests retained by the debtor. *See Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939); *In re Potter Material Service, Inc.,* 781 F.2d 99, 101 (7th Cir.1986); *In re Sovereign Group 1985–27, Ltd.,* 142 B.R. 702, 708–09

**886**

(E.D.Pa.1992); and *In re Tallahassee Associates, L.P.*, 132 B.R. 712, 718 (Bankr. W.D.Pa.1991). *But see, e.g., In re Greystone III Joint Venture*, 948 F.2d 134, 142–44 (5th Cir.1991), *vacated in part* (5th Cir. Feb. 27, 1992); and *In re Winters*, 99 B.R. 658, 663 (Bankr.W.D.Pa.1989) (new value exception to absolute priority rule no longer exists).

■ We recognize the general validity of the Debtors' argument that Chapter 11 should be applied evenly to all debtors eligible to utilize it. The Code, and Chapter 11 in particular, draws no broad distinctions between business and consumer debtors. *See Toibb v. Radloff,* —— U.S. ——, 111 S.Ct. 2197, 2201–02, 115 L.Ed.2d 145 (1991).

■ However, there are several fundamental distinctions between business and consumer cases which we believe limit the application of the "judge made" rule of the new value exception in consumer cases. Firstly, as we pointed out in *222 Liberty, supra*, 108 B.R. at 984, the purpose of the new value exception is to encourage equity holders of businesses, who wish to retain their interests in a debtor who plan to retain an ongoing business, to make capital contributions necessary to allow the debtor-business to survive. We reached that result because we believed that such a result would serve the primary goal of Chapter 11. That goal is to allow a viable business to remain in existence, thereby benefitting not only the owners of the business, but also benefitting unsecured creditors, who would be unlikely to receive much, if any, recovery in liquidation; all employees of the business, whose jobs and earnings will be saved; and ultimately, the American economy in general, which is benefitted by expansion as opposed to contraction of business activity.

It is difficult for this court to see how any of these policy considerations apply to Chapter 11 debtors who are not businesses nor in business, and are simply consumers. The outcome of this case clearly will not benefit any potential employees of the Debtors, as the Debtors hire no employees except possibly a maid and babysitter, nor will it keep a business running to enhance the economy. The Debtors, unlike a business, will probably survive the instant bankruptcy case physically, whether it remains in Chapter 7 or Chapter 11.

The only policy argument that is not directly tied to benefits to the Debtors only which supports the new value exception in this context is the benefit to the unsecured creditors through a prospect of a larger dividend on their claims. If the Debtors are forced into an imminent liquidation, the Husband's future wages and their other assets listed on page 881 *supra* would be unavailable to unsecured creditors and such creditors would thereby presumably suffer even greater economic injury than they would otherwise.

However, it is this very group of unsecured creditors which is actively opposing confirmation of the instant Plan. Presumably, these parties are better able to recognize what is in their own best interests than are the Debtors or this court. If we read the position of these parties accurately, we believe that they do want the Debtors to avoid liquidation. However, they believe that the Debtors can feasibly make larger payments to them than the Plan provides, and they apparently believe that, if compelled to do so by denial of confirmation, the Debtors *will* agree to pay more to them and retain less for themselves. In this context, the confirmation process breaks down to a determination of whether this court feels that the Debtors have agreed to give the unsecured creditors enough.

Another distinction between business and consumer cases arises in light of the Debtor's request that we find that the Husband's wages are a new value contribution. In a Chapter 11 business case, it is assumed that the debtor-business will contribute its future earnings to a plan of reorganization. Such future earnings are not considered an aspect of a new value contribution, but a natural and necessary source of plan funding. New value arises in business cases only if contributions are offered over and above future earnings. We therefore question whether such earnings should be included in the computation of the Debtors' new value offer.

A final distinction between business and consumer debtors arises from the concept of a "going concern." It is often important to keep a business operating, at least until it can be sold, to preserve its "going-concern" value. If a business can be sold as a whole, intact, functioning unit, as opposed to being sold in piecemeal fashion, the value of its assets in liquidation will typically be significantly enhanced. Liquidation often leads to disposal of inventory or machinery at cut-rate prices. Moreover, liquidation usually makes collection of accounts receivable from customers who cannot anticipate any future relationship with the debtor a difficult proposition.

On the other hand, there are no comparable considerations which justify keeping the instant Debtors in Chapter 11. The property owned by the Debtors consists of liquid assets and consumer goods, such as their residences, for which there is an available market. The value of such property is unlikely to be greatly enhanced or deflated whether it is sold as a unit or in individual parcels. None of the considerations which favor the retention of a debtor as a "going concern" enters the picture.

We therefore can find numerous policy reasons for not extending the application of the new value exemption to consumer debtors very far, if at all.

We now turn to consideration of the few individual Chapter 11 cases cited by the parties to this court as examples of instances where the new value exception was at issue.

In *In re Pecht*, 57 B.R. 137 (Bankr. E.D.Va.1986), the debtor operated a firewood business. The determinative issue on confirmation proved to be whether the debtor could, as he proposed, treat his contribution of all of the net income from his business as a potential new value contribution to the estate. The court held that only "the value of services personally performed by the debtor" fell within the 11 U.S.C. § 541(a)(6) exception. *Id.* at 141. Therefore, it refused to allow the debtor to proceed to confirmation with a plan which contemplated treatment of all of the business's assets as new value.

*In re Devine*, 131 B.R. 952 (Bankr. S.D.Tex.1991), involved a physician and his wife who filed a joint Chapter 11 case. The court emphasized the debtors' role as fiduciaries of their estate in light of the absence of a trustee to serve that function. *Id.* at 956. Although denying a creditor's motion to dismiss the case, the court carefully scrutinized the debtors' history of expenditures for what the court deemed extravagances and strongly suggested that it believed that appointment of a trustee would be appropriate. *Id.* at 957.

*In re Yasparro*, 100 B.R. 91 (Bankr. M.D.Fla.1989); and *In re East*, 57 B.R. 14 (Bankr.M.D.La.1985), both involved consumer debtors. In *East*, the court rejected the debtor's argument that, since he was insolvent, he was not retaining anything of value in keeping all of his property. *Id.* at 15–19. Near the end of its decision, the court considers the issue of what a consumer-debtor might have to do to satisfy the new value exception and states, *id.* at 19, as follows:

> it might be that the injection of "outside capital" would allow cram down in an individual case. It is easier in a corporate context to consider the concept of the injection of outside capital; when an individual is involved, it is difficult to imagine the source of such funds: perhaps a relative or friend might make a gift; perhaps there are other sources.

In *Yasparro, supra,* 100 B.R. at 98–99, the court rejected the debtor's argument that his provision of promissory notes to creditors constituted a sufficient contribution of new value to circumvent the effect of the absolute priority rule. Quoting the above passage from *East, supra,* with approval, the court observes that "on rare occasions will an individual Chapter 11 debtor be in a position to cramdown his unsecured creditors and still retain property." *Id.* at 99.

Two final cases, *In re Henke*, 90 B.R. 451 (Bankr.D.Mont.1988); and *In re Baugh*, 73 B.R. 414 (Bankr.E.D.Ark.1987), are farm cases. *Baugh*, decided prior to *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169

(1988), refused to extend the reasoning of the Eighth Circuit's decision, reversed in *Ahlers*, that "sweat equity" could constitute new value to the facts before it. 73 B.R. at 418–20. In *Henke*, the plan was confirmed. However, the new value in issue was $680,000, an amount far in excess of the debtor's total unsecured debt, 90 B.R. at 956, which was the debtor's income from an invention, a source unrelated to his farm business.

Of these cases, only *Yasparro* and *East* involved consumer debtors. In the other cases, the policy considerations in favor of application of the new value exception in a business context were present. In both *Yasparro* and *East* the courts concluded that the only contributions to be considered as "outside capital" were truly extraordinary contributions from totally new outside sources unrelated to the debtors' day-to-day earnings. The *Henke* case, in addition to being a farm-business case, was the exception that proved the rule: the contribution was a very large sum, sufficient to pay all unsecured claims, from a source totally unrelated to the debtor's farm operations. The *Devine* case suggests that scrutiny of the debtor's expenditures and lifestyle is appropriate, and that the new value exception will be applied only where the debtor is expending liquid assets in a manner consistent with the debtor's fiduciary duties to all creditors.

The Debtors argue that they are contributing over $300,000 in otherwise exempt assets and future earnings which are not property of their estate, and are retaining only $166,000 in non-exempt assets. However, the net of payments to the estate, less than $150,000, is not sufficient to put much of a dent in the large total debt of the unsecured creditors. There may, therefore, be a question as to whether this contribution is sufficient to be considered "substantial."

After consideration of these authorities, there still remains considerable doubt in our mind as to whether a consumer debtor can ever use the new value exception. The only successful individual case was that of the *Henke* farmer-inventor, whose farm op-

eration appears to have taken him out of the category of a consumer debtor. We also question whether the particular property contributed by the Debtors, particularly the Husband's future wages, are sufficiently "outside" of the Debtors' normal "operations" as to constitute new value. Elimination of the post-petition earnings of about $180,000 out of the sum which is claimed as part of the Debtors' new value contribution brings the sum of contributions to about $125,000, a figure considerably less than the 166,000 retained by them as non-exempt property.

3. *The Debtors' Lavish Expenditures on Themselves Render Their Plan Violative of 11 U.S.C. §§ 1129(a)(3) and (b)(1).*

■ At the very least, measuring the instant consumer debtors' efforts to avoid the absolute priority rule requires us to carefully scrutinize their fulfillment of all of the pertinent Code requirements. This scrutiny results in our conclusion that the instant Plan is, in several respects, deficient.

■ Firstly, we find the Debtors' budget to reflect the same unwillingness to curtail a high-cost lifestyle which the court in *Devine* found impossible to tolerate from Chapter 11 debtors-in-possession. The Husband anticipates earnings of at least $400,000 annually, or $33,333.33 monthly. Income taxes will probably reduce the net sum to about $22,000 monthly. Outside of the two mortgage payments, totalling over $11,000, the Debtors recite what appear to us to be clearly excessive monthly expenditures in several instances. In this critique of the Debtors' spending pattern, it must be recalled that the Wife apparently remains home with the Debtors' children, making any except incidental expenditures for "child care" and "laundry, dry cleaning, and maid service" of doubtful propriety. We believe that the Debtors must pare down the following entries in the first column of their Budget, *see* pages 882–83 *supra*, as follows:

| ITEM | BUDGET | SHOULD BE | REDUCTION |
|---|---|---|---|
| Telephone | $ 250 | $100 | $ 150 |
| Home Maintenance | 1,000 | 200 | 800 |
| Clothing | 500 | 200 | 300 |
| Laundry, dry cleaning, maid | 400 | 100 | 300 |
| Medical & dental | 150 | 50 | 100 |
| Recreation, Clubs, etc. | 500 | 100 | 400 |
| Child care | 1,100 | 100 | 1,000 |
| | | | $3,050 |

These deductions would reduce the Debtors' monthly expenditures, exclusive of their mortgage payments, to about $10,000 monthly. *Compare, e.g., In re Capodanno,* 94 B.R. 62, 66 (Bankr.E.D.Pa.1988) (family of nine claims total monthly expenses of $1,860); and *In re Navarro,* 83 B.R. 348, 350 (Bankr.E.D.Pa.1988) (family of four claiming it has expenses of about $1,000 is attacked for "extravagant" religious contributions and parochial school expenses of $220 monthly).

Many of the expenses remaining are due to the Debtors' unnecessary maintenance of two residences. One of these, preferably the Philadelphia home, should be sold by a specific date. The Debtors might even consider allowing one of the homes to be foreclosed upon, as further expenditures on two homes are very difficult to justify. Eliminating payments on one home would reduce the $11,100 monthly mortgage payments by *some* amount (say $5,000) and would also reduce expenditures for taxes, utilities, and home maintenance. If one of the homes is eliminated and $5,000 is deducted from monthly mortgage payments, and $4,000 is deducted from the Debtors' monthly expenditures, the Debtors' total monthly expenditures (including the mortgages) would be decreased from about $24,000 to about $15,000. The Debtors could then contribute at least $7,000 monthly towards payment of unsecured debts.

■ We find that a debtor's failure to make anything close to the best offer of payment to the creditors violates both 11 U.S.C. §§ 1129(a)(3) and (b)(1). It is not an act of "good faith" to propose a plan in which the Debtors retain one hundred (100%) of the expenditure necessary to support a lavish lifestyle, and, consequently, require the creditors to either wait 30 years for payment or accept a guaranteed payment of fifteen (15%) percent—or twenty-five (25%) if they are lucky. *See In re Kemp,* 134 B.R. 413, 414–15 (Bankr. E.D.Cal.1991); and *Devine, supra,* 131 B.R. at 956–58.

■ We also conclude that the unsecured creditors are not being dealt with "fairly and equitably," pursuant to § 1129(b)(1). The burden of proving conformity with each and every requirement of § 1129 always rests with a plan proponent. *Cf. In re Fricker,* 116 B.R. 431, 437–38 (Bankr.E.D.Pa.1990). Further, we agree with the statements of the court in *Tallahassee Associates, supra,* 132 B.R. at 718, that a "rigorous showing" of all elements of § 1129(b) is a prerequisite in a cramdown situation. Under this standard, and in light of heightened scrutiny with which we must assess the Debtors' satisfaction of the Code requirements because of their attempt to invoke the new value exception, we find that the Debtors' excessive expenditures precludes a showing that the Debtors' Plan is "fair and equitable" to the Objectors.

4. *The Debtors are Entitled to a Further Opportunity to Attempt to Reach Agreement With the Objectors.*

■ Although we are prepared to deny confirmation of the Plan, we also find that this is an appropriate case in which to allow

the Debtors a further opportunity to prepare an Amended Plan to cure the defects in the current Plan. *See In re 641 Associates, Ltd.,* 140 B.R. 619 (Bankr.E.D.Pa. 1992). The Debtors have apparently made peace with their entire secured creditor body. The desideratum would be for the Debtors and the Objections to come to a resolution between themselves regarding treatment of unsecured creditors. We believe that putting a deadline on the sale of the Philadelphia property and an agreement by the Debtors to cut their own expenditures and pay the savings over to the creditors would or should be sufficient to garner the Objectors' cooperation. We trust that none of the parties are interested in lengthy, expensive litigation and that the emergence of a consensual plan could therefore easily occur. Consent to a plan by the Objectors would, of course, allow the Debtors to avoid confrontation with the absolute priority rule in their plan-confirmation process.

D. CONCLUSION

An Order consistent with the within Opinion will be entered.

ORDER

AND NOW, this 2nd day of July, 1992, after a hearing of June 3, 1992, to consider confirmation of the Debtors' Plan of Reorganization ("the Plan"), and upon consideration of the several Briefs submitted by the parties, it is hereby ORDERED AND DECREED as follows:

1. Confirmation of the Plan is DENIED.

2. The Debtors shall file an Amended Plan and an accompanying Amended Disclosure Statement, in form and substance not inconsistent with the accompanying Opinion, serving black-lined copies of same upon the court in chambers and all counsel appearing on the Mailing List which follows, and notifying all interested parties of the filing of the Amended Disclosure Statement, on or before July 15, 1992.

3. A hearing on the further Amended Disclosure Statement is scheduled on WEDNESDAY, AUGUST 12, 1992, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

4. If the Debtors fail to comply with this Order, this case may be converted to a Chapter 7 case without further notice and hearing.