**In re CAPITAL CENTER EQUITIES, A Pennsylvania Partnership, Debtor.**

**Bankruptcy No. 91–13286S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 2, 1992.

---

Daniel Morman, Philadelphia, Pa., for debtor.

Harry A. Horwitz, Davis, Reberkenny & Abramowitz, Cherry Hill, N.J., for Estate of Wm. Gordon.

Steven P. Burkett, Levy, Angstreich, Finney, Mann, Baldante & Burkett, P.C., Philadelphia, Pa., Prior Counsel, for Estate of Wm. Gordon.

Barbara Backman, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for Hamilton Bank.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

In deciding whether to confirm the Third Amended Plan of Reorganization ("the Plan") presented by CAPITAL CENTER EQUITIES ("the Debtor"), a partnership which owns a small strip shopping center known as Capital Center, located proximate to Camp Hill, Pennsylvania ("the Center"), we are required to consider, as we did in *In re Egan,* 142 B.R. 730 (Bankr.E.D.Pa.1992); *In re Harman,* 141 B.R. 878, 23 B.C.D. 209 (Bankr.E.D.Pa.1992); and *In re 222 Liberty Associates,* 108 B.R. 971, 983–85 (Bankr. E.D.Pa.1990), the application of the "new value exception" to the "absolute priority rule" in the context of a small entity owned by one or two individuals, as opposed to a large public company.

We conclude that, by offering to contribute $50,000 in the context of a plan which will result in payment to unsecured creditors of only ten (10%) percent of their claims, George Diemer and Robert Pacilli, the Debtor's co-general partners, have not offered sufficient new value in the Plan to clearly exceed the value of the equity which they seek to retain or to make what constitutes a "substantial" contribution. Therefore, confirmation of the Plan is denied. However, we are prepared to state that the partners' willingness to contribute an additional $75,000 would satisfy the requirement that their contribution equal the equity retained, and would allow an adequate, twenty-five (25%) percent return to unsecured creditors, and render a plan confirmable. Since the Debtor may be capable of submitting such a plan, we will allow the Debtor an opportunity to file a further amended plan.

## B. FACTUAL AND PROCEDURAL HISTORY

The main event in this case to date has been the successful effort of the Debtor to avoid the secured status of the claim against the Debtor of the Estate of William Gordon ("the Estate") in an adversary proceeding, the decision in which is reported as *In re Capital Center Equities,* 137 B.R. 600 (Bankr.E.D.Pa.1992) (cited hereafter as *"CCE I"*). The Estate attempted to assert ownership of, or a mortgage secured by, the Center. We ultimately held, in *CCE I,* 137 B.R. at 608–12, that the failure of the Estate's decedent to properly record his deed, which we believed was best characterized as a document to secure an advance of $220,000 to the Debtor, allowed the Estate's purported "title" of, and security interest in, the Center to be avoided pursuant to 11 U.S.C. § 544.

In *CCE I,* we denied the only proof of claim filed by the Estate against the Debtor at the time, since that claim was a claim for rent, and we held that the Debtor was the owner of the Center and therefore not liable for rent. *Id.* at 612. However, we also observed that, in light of our decision in *CCE I,* the Estate appeared to be entitled to file an amended proof of claim under 11 U.S.C. § 502(h). *See also* Federal Rule of Bankruptcy Procedure 3002(c)(3).

The Estate proceeded to file, on March 19, 1992, just six days after the rendering of the *CCE I* Opinion of March 13, 1992, an unsecured proof of claim in the amount of $220,000, reflecting the unpaid principal of the "loan" of its decedent to the Estate. The Debtor, almost as promptly, on March 30, 1992, objected to this claim. After a hearing on May 20, 1992, we entered an Order of May 22, 1992, overruling the Objection, stating as follows:

> Allowing the Estate to make a claim for the principal amount of what the Debtor argued, in Adversary No. 91–0793S, *was* a loan seems quite equitable under the circumstances. *See* [*CCE I,* 137 B.R. at 604]. The Debtor offered to pay considerably more than the sum claimed at an earlier time before 11 U.S.C. § 544(a) intervened. *Id.* at 606,

613. The instant claim appears to be an amendment to the Estate's earlier, timely claim, adjusted in light of the decision in the proceeding, and therefore is not barred by the bar date.

The confirmation process has been and continues to be driven by the dispute between the Debtor and the Estate. The Debtor has apparently negotiated a resolution with Hamilton Bank ("the Bank"), its only remaining secured creditor, regarding the treatment of its claim. No other creditors have participated in the case.

In *CCE I,* we noted that the Debtor had been directed to file a Plan of Reorganization and Disclosure Statement on or before April 1, 1992. These documents were timely filed, and, after several amendments, the Disclosure Statement was approved for distribution on May 21, 1992. However, in light of our Order of May 22, 1992, relative to the Estate's claim, the Debtor requested and received permission to file a further Amended Plan and Disclosure Statement. The result was the Plan in issue and another draft of a Disclosure Statement, which was approved on June 17, 1992. A confirmation hearing was scheduled on July 22, 1992.

The Plan provides for resumption of monthly payments to the Bank (Class 2) under the terms of the original mortgage note, with an extension of the term of the mortgage from March, 1992, to November, 1994; additional payments of $1,500 monthly on arrearages; and a deposit of $50,020 into a "cash collateral account" to pay the Bank for interest, late charges, and penalties. This treatment was apparently negotiated between the Debtor and the Bank.

The Plan also provides that unsecured creditors (Class 3) are to receive payment of ten (10%) percent of their claims plus six (6%) percent interest. The funds for these payments are to be generated by the Debtor's excess cash flow, but in any event to be paid in full within thirty (30) months.

The Debtor's general partners, Diemer and Pacilli, are Class 4 creditors entitled to retain their ownership interests in consideration for (1) contribution of $50,000 earmarked for payment of administrative

claims; (2) provision of free management services; and (3) their commitment to cover deficits in the Bank's "cash collateral account."

Prior to the July 22, 1992, hearing, a Report of Plan Voting was filed, which indicated acceptance by all creditors of the Debtor, including all five unsecured creditors voting on the Plan other than the Estate, whose claims totalled about $21,-000. However, the Estate rejected the Plan, and the size of the Estate's claim was easily large enough to prevent acceptance of the Plan by Class 3. *See* 11 U.S.C. § 1126(c). The Estate also filed three rather opaque Objections to confirmation: (1) The Plan provided "insufficient value" on account of the Estate's claim; (2) The Plan, in referencing the fair market value and liquidation value of the Center at $725,000 and $525,000, respectively, understated the value of the Center by $400,000; and (3) Any release of claims against Diemer and Pacilli individually was impermissible.

At the outset of the confirmation hearing of July 22, 1992, the Estate conceded that the Debtor had not sought to release any individual claims against Diemer and Pacilli in the Plan, and abandoned that Objection. The Estate ultimately designated the issues as whether the Plan satisfied (1) the "liquidation test" of 11 U.S.C. § 1129(a)(7)(A)(ii); and (2) the "new value exception" to the "absolute priority rule," as articulated in 11 U.S.C. §§ 1129(b)(1), (b)(2)(B)(ii).

As might be expected, given the presence of two issues which focused on this issue, the crucial testimony pertained to the issue of the value of the Center. William J. Daylor, the Estate's expert, opined that the market value and liquidation value of the Center were, respectively, $1,035,000 and $925,000. The Debtor's expert, M. Richard Cohen, testified that the market value and the liquidation value were, respectively, $725,000 and $543,000. Furthermore, Cohen stated that, if an environmental problem were identified on the Center's realty, as Diemer claimed to be the case in light of the presence of a nearby former railroad yard, a mere study of such a problem would entail a cost of about $25,000 which he had not factored into his appraisal.

The Bank, presenting support for the Debtor, attempted to call an appraiser employed by a firm which had prepared an appraisal for the Bank in September, 1991, and who was prepared to endorse it, but who had not actually worked on the appraisal. We sustained the Estate's objection to this testimony. However, the Bank's counsel pointed out that Joseph A. Campanella, who had actually performed the appraisal, had departed for vacation before the Estate had filed its Objections and was only for that reason unavailable. These assertions, and the vagueness of the Estate's Objections even when filed, convinced us that the Bank was reasonably unaware, before its appraiser became unavailable, that evidence on value would become significant to confirmation of the Plan. We therefore agreed to continue the completion of the hearing until July 30, 1992, the day after Campanella was due to return from vacation and the only date in the next two weeks when all counsel were available. We also invited the interested parties to submit Briefs addressing the confirmation issues on or before July 29, 1992.

As it developed, Campanella could not be available on July 30, 1992, and a mutually-convenient date to complete the hearing could not be set until August 25, 1992. The Debtor timely submitted a Brief on July 29, 1992. Although no submission from the Estate was forthcoming, we allowed it a requested extension until August 7, 1992, provided that the Debtor then received an extension until August 20, 1992, to reply. Nevertheless, it was not until August 10, 1992, that the Estate submitted a Brief, in the form of a letter to the court. The Debtor filed a timely reply.

On August 25, 1992, Campanella testified in support of his company's appraisal. Campanella was unable to identify any motivation of the Bank, ulterior or otherwise, in requesting his appraisal, and none was suggested. His appraisal valued the Center's market value, as of September, 1991, at only $700,000.

On August 25, 1992, the Debtor also called as a witness Donald Bello, a geologist who had prepared a "Phase I" environmental Site Assessment Report on the Center's property on June 10, 1992. Bello had recommended that a "Phase II" study to further analyze certain conditions observed during the initial study be performed, and estimated the cost of such a further study and remedial measures at $57,000.

Daylor, previously called only as of cross-examination by the Debtor, was recalled by the Estate and supported his earlier figures despite the intervening testimony.

The principal difference in the figures produced by Daylor and Cohen in their respective contemporary appraisals arose from the fact that the former applied a ten (10%) percent capitalization rate in performing his "income analysis," while Cohen chose a capitalization rate of twelve and a half (12½%) percent. Daylor was comfortable with the fact that his result indicated a slight appreciation of the value of the Center since 1988, when it was appraised by a different appraiser for the Estate at about $1 million. All parties appeared inclined to accept the accuracy of the $1 million figure as of 1988.

Diemer emphasized the very poor local real estate market. He also noted that the Center had, like many of his projects, originally been built to house a Color Tile store, and that the presence of this anchor tenant had resulted in three of the four tenants being sellers of home improvement products, an industry which he claimed was suffering badly in the current recession. The fourth store had been previously occupied by a computer-supply establishment, had been vacant for about two years, and had recently been rented to a small, family-owned computer-supply sales company, with a sizable rent abatement at a reduced rental rate at about $10 per square foot. Cohen relied on the assessment of this new tenant as unstable in concluding that the value of the Center had declined since 1988.

Campanella utilized an eleven (11%) percent capitalization rate in the course of the income analysis in his appraisal. However, he established the rental value of the Center at $8.50 per square foot, a figure considerably beneath the rate of $10 per square foot charged to the computer store, which Diemer had itself characterized as reduced below the expected rate. We are, however, impressed with the relative disinterest of Campanella in rendering his report and gave this appraisal considerable weight for that reason, even though it is one year old. *Compare In re Cole*, 81 B.R. 326, 328–29 (Bankr.E.D.Pa.1988); and *In re Blakey*, 76 B.R. 465, 469–72, *modified on other grounds*, 78 B.R. 435 (Bankr.E.D.Pa. 1987) (considerable weight given to value estimates prepared for purposes unrelated to issues at bar, despite age of estimates).

We were, however, unimpressed with the Debtor's efforts to significantly reduce the Center's value due to environmental factors. Bello has never been on site, and his firm's study failed to establish, in our mind, any hard evidence of a real environmental problem. None of the appraisers noted environmental concerns in their appraisals. The cost figures quoted by Bello were principally those of doing reports and tests, which a prospective buyer of the Center may or may not consider necessary and admittedly may or may not yield any firm findings of real environmental problems.

We were also unimpressed by the Debtor's efforts to deflate the value of its owners' interests, as parties in a partnership, below the market value of the Center. It is perhaps true that, if we were evaluating the interests of one of the partners, *e.g.*, Diemer, in the Center, we would be obliged to reduce the value of that interest alone by some factor rather than evaluate it at one-half of the total value of the Center. However, the Plan contemplates retention of the Center by the Debtor *partnership*, remaining intact. We agree with Daylor's assessment that, in such a case, there is no reason to consider the value of the interests of the individual partners in the process of evaluating the Center for purposes of the issues pertinent to the Plan.

We find the value of the Center to be $750,000. The disinterested work-product

of Campanella convinces us that Cohen's figure is closer to the mark than is that of Daylor. Daylor's capitalization note is too low and all of the other witnesses agreed, we think correctly, that the value of the Center has declined substantially since 1988. We nevertheless find that Campanella's assumptions regarding the market rate of rentals was too low and that Cohen's capitalization rate was too high. We give some consideration to the vague potential environmental problems on the Center's property in reaching this conclusion.

We find that the liquidation value of the Center is about $625,000. In so doing, we adjusted the market value at a rate slightly above the mid-point in the twenty-five (25%) percent reduction figure posited by Cohen and the ten (10%) percent figure proffered by Daylor.

## C. DISCUSSION

As we indicated above, the Estate ultimately argued that the Plan could not be confirmed because it violated 11 U.S.C. § 1129(a)(7)(A)(ii) ("the liquidation test") and 11 U.S.C. §§ 1129(b)(1), (b)(2)(B)(ii) ("the absolute priority rule"). The statutory provisions in issue read as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

.    .    .    .    .

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; ...

.    .    .    .    .

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met

with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that the plan be fair and equitable with respect to a class includes the following requirements:

.    .    .    .    .

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property....

We found the reasonable liquidation value of the Center to be around $625,000. The liquidation value of the Center therefore does not exceed the Bank's secured claim of about $610,000 plus attorneys' fees and costs estimated at $15,648.70. *See* 11 U.S.C. § 506(b). We are therefore satisfied that the liquidation test of § 1129(a)(7) is met here. We note that, in its letter Brief, the Estate devotes very little attention to this issue, which is perhaps a concession that this is not its strongest argument.

However, since the Debtor contemplates retention of the Center, we are not prepared to consider the liquidation value, transfer costs, or consider the reduced value of the individual partners' interests in measuring the market value of the Center. *See In re 222 Liberty Associates*, 105 B.R. 798, 802–05 (Bankr.E.D.Pa.1989). The Debtor can prevail only by convincing us that it meets all of the criteria of the "new value exception" to the "absolute priority

rule" in light of a given equity of the Debtor of about $125,000 in the Center.

The Estate does not contest the availability of the "new value exception" in this context. This conclusion is, of course, consistent with our own decisions in cases involving debtors which are engaged in business. *See 222 Liberty Associates, supra,* 108 B.R. at 983–85. *See also, e.g., In re Snyder,* 967 F.2d 1126, 1128–30 (7th Cir.1992); *In re Bryson Properties XVIII,* 961 F.2d 496, 503–05 (4th Cir.1992); and *In re Sovereign Group 1985–27, Ltd.,* 142 B.R. 702, 705–08 (E.D.Pa.1992).

We have noted, in *Harman, supra,* 141 B.R. at 884–88, 23 B.C.D. at 212–14, that some of the policy reasons for recognition of the new value exception do not appear to fit into the context of a consumer debtor bankruptcy. In *Egan, supra,* 142 B.R. at 732, we pointed out that consumer debtors need not be concerned about the absolute priority rule at all, let alone the new value or any other exception to this rule, when they do not retain any exempt property. The instant Debtor cannot, however, sweep around the absolute priority rule in the manner of the *Egan* debtors, because its partners *do* intend to retain their interests in all of the Debtor's assets. Nevertheless, since the Debtor is a business entity, the Debtor can successfully argue that the policies behind the new value exception, which may elude consumer-debtors such as the Harmans, are fully applicable here.

However, the Debtor, though a business entity, has, as its only business, the ownership and operation of a small shopping center. It is a realty partnership owned by two individuals. We might further observe that the only visible owner through the *CCE I* proceeding and the instant proceedings has been Diemer. We understand that Pacilli is seriously ill and permanently resides in Florida.

Therefore, this Debtor is easily distinguishable from a public company, the type of business for which the criteria for application of the new value exception "was originally designed" in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). R. Nimmer,

*Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions,* 36 EMORY L.J. 1009, 1056 (1987). Hence, the Debtor is clearly properly characterized as a "sole proprietorship owned and operated by individuals or families." *Id.* at 1068. Therefore, rather than focusing our concern, in applying the tests for determining whether the Plan satisfies the new value exception, on leverage and control of the Debtor, as would be appropriate in the case of a public corporation, *id.* at 1050–68, we should be concerned, here, with a determination of whether the Debtor's principals are making their "best effort" to pay their creditors. *Id.* at 1070–81. It should be noted that we ultimately utilized a "best effort" analysis in confirming the *Egan* plan, at 733–34, and denying confirmation of the *Harman* plan. 141 B.R. at 887–90, 23 B.C.D. at 214–15.

We now note the "classic" prerequisites which must be met by a debtor to allow it to successfully invoke the new value exception to the absolute priority rule. As stated in *Snyder, supra,* 967 F.2d at 1131:

In *Los Angeles Lumber* the Supreme Court declared that a qualifying new value contribution must be (1) necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably equivalent to the interest retained. 308 U.S. at 121–22 [60 S.Ct. at 10]. The cases also make clear that a contribution must be substantial, *In re Potter Material Serv., Inc.,* 781 F.2d 99, 101 (7th Cir. 1986), and "up front," *In re Stegall,* 85 B.R. 510, 514 (C.D.Ill.1987), *aff'd,* 865 F.2d 140 (7th Cir.1989); and *In re Olson,* 80 B.R. 935, 937 (Bankr.C.D.Ill.1987), *aff'd,* [1989 WL 330439] 1989 U.S. Dist. LEXIS 18177 (C.D.Ill.1989).

*See also Sovereign Group, supra,* 142 B.R. at 708; *Harman, supra,* 141 B.R. at 885–87, 23 B.C.D. at 213; and *222 Liberty Associates,* 108 B.R. at 983–84.

We conclude, first of all, that the contribution of the Debtor's partners is only about $50,000. We are not prepared to consider their free management services or their contingent commitment to cover deficits to the Bank as contributions in the

form of money or "up front," respectively. The reasonably equivalent value of the equity which they would be retaining in the Debtor is about $125,000. In *Harman*, we noted that the owners' contribution must "equal ... or exceed ... the value of the property interests retained by the debtor." The Plan clearly fails to meet this requirement.

█ The Debtor reaches the conclusion that it meets this prong of the *Los Angeles Lumber* test only by discounting the value of the Debtor's interest through consideration of the value of the individual partners' interests in the Debtor and by deducting the "retained liabilities" to the unsecured creditors provided thereby. As is referenced at page 10 *supra*, we do not believe that it is appropriate to consider any interest in the Center except the Debtor's whole, "unfactored" interest when it intends to retain the Center intact. It is unclear to us what is meant by the "retained liabilities" of the Debtor. The Plan will discharge all future liabilities of the Debtor to unsecured creditors. The value of what the Debtor retains is therefore measured by simply deducting what equity is retained ($125,000) from what is proposed to be contributed in cash ($50,000). The shortfall of $75,000 is the additional amount which the Debtor's partners must contribute to satisfy this prong of the *Los Angeles Lumber* test.

█ The *Snyder* court makes clear that the requirement that a "new value contribution" must be "substantial" exists apart from the requirement that the payment must at least equal the value of the interests retained by the debtor. 967 F.2d at 1131. The *Snyder* court found that a cash infusion of $30,000, which would result in a dividend of about three (3%) percent to unsecured creditors, was not sufficiently "substantial" to satisfy this second prong of the *Los Angeles Lumber* test. *Id.* at 1131–32.

The cash infusion proposed here is at least $50,000 and the proposed dividend to unsecured creditors is ten (10%) percent. This dividend seems small, particularly to the Estate, which, by effect of 11 U.S.C. § 544, has fallen from the status of owner of the Center or at least a creditor secured by it, to a creditor entitled to recover but $22,000. In its Reply Brief, the Debtor recognizes the court's consideration of the overall equity picture vis-a-vis it and the Estate. In its Order of May 22, 1992, *see* page 266 *supra*, for instance, the court noted that Diemer had offered to pay the Estate $437,500 to liquidate its interests in the Center in August, 1988, *see CCE I*, 137 B.R. at 606, 613, and therefore it should consider itself fortunate to be found owing but $220,000 to the Estate. Consequently, the Debtor attempts to reargue this court's determination of May 22, 1992, overruling the Debtor's objections to the amount of the Estate's claim. To this, we make three responses: (1) While reconsideration of this claim under Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3008 is theoretically possible, grounds for same appear absent. *See In re Motor Freight Express, Inc.*, 91 B.R. 705, 710–11 (Bankr.E.D.Pa.1988), *appeal dismissed*, 94 B.R. 346 (E.D.Pa.1988). Rehashing of arguments made earlier or making new legal arguments available but not offered at the time of the decision would not appear a sufficient basis on which to invoke F.R.B.P. 3008; (2) In any event, the Debtor has *not* invoked F.R.B.P. 3008 to date; and (3) The new technical legal arguments articulated do not advance the cause of the Debtor's equities vis-a-vis those of the Estate.

█ Nevertheless, it is apparent that the instant Debtor is not a large public corporation. Despite its extensive prehearing discovery of the assets of the partners, the Estate has not suggested, by proof through evidence at the hearings nor in argument, that the payment of even the $50,000 offered is not the "best effort" which the Debtor's partners could muster. Perhaps somewhat at odds with the analysis of the *Snyder* court, we believe that such an emphasis on whether the payment proposed represents the Debtor's best effort is the proper focus in a case involving a debtor who is an individual or is made up of a small group of interest holders rather than, exclusively, the amount of the contri-

bution or the percentage of the return projected to creditors.

In order to satisfy the "reasonably equivalent value" prong of the new value exception, the Debtor's principals must contribute about $75,000 more than they have to date. Such a cash infusion would result in availability of about $100,000 to pay unsecured creditors. (We assume that a ten (10%) percent dividend to creditors totalling about $300,000 under the present Plan would require total funding of $30,000; an additional $75,000 would bring this figure to about $100,000). The contribution of an additional $75,000 would result in a dividend to unsecured creditors, including the Estate, of about thirty (30%) percent. Such a payment, given the limited financial means of the Debtor's partners, would, in our view, constitute the partners' "best effort" and satisfy the "substantiality" requirement.

It is unclear whether the Debtor's partners have the means or inclination to raise the requisite additional $75,000. However, their efforts to date have been substantial and they deserve an opportunity to make the final performances requisite to achieve confirmation. They have successfully significantly reduced the Estate's rights against the Debtor and apparently satisfied the Bank, which has vigorously supported the Plan. A compromise of the treatment of the Bank may, unfortunately for it, be the only alternative source of funding of the necessary additional contribution. The three interested parties (the Debtor, the Bank, and the Estate) would do well to revitalize the settlement efforts which seemed so bright six months and countless court appearances ago. *See CCE I,* 137 B.R. at 603.

Therefore, we urge the parties to attempt to resolve this matter and produce a consensual plan between them. *See In re 641 Associates, Ltd.,* 140 B.R. 619, 633 (Bankr.E.D.Pa.1992); and *Harman, supra,* 141 B.R. at 889–90, 23 B.C.D. at 215. However, if this effort does not succeed, we will allow the Debtor to prepare a Fourth Amended Plan of Reorganization, consist-

ent with the conclusions reached in this Opinion, if it so desires.

## D. CONCLUSION

An Order denying confirmation of the Plan, but allowing the Debtor to make one further attempt at achieving confirmation, will be entered.