**In re Richard O. LUNDEEN, D.P.M., Debtor.**

**Bankruptcy No. 94–5966–RLB–11.**

United States Bankruptcy Court, S.D. Indiana.

March 27, 1997.

David L. Dunlap, Indianapolis, IN, for Debtor.

James A. Knauer, Indianapolis, IN, for Indianapolis Podiatry.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

The issue before the Court is whether the goodwill of the Debtor's podiatry practice is an asset of the bankruptcy estate.

The Debtor, Richard O. Lundeen, obtained his license for the practice of podiatric medicine in the State of Indiana in 1977. He served a one year residency at Westview Hospital in 1978, and he became an employee of Jack B. Glick, D.P.M. upon the completion of his residency. By the time he completed six years of continuous employment with Dr. Glick, the Debtor had become a 50% interest holder with Dr. Glick in the podiatry practice operating in the North Guion Road vicinity. This office is known as the Westview Office.

In 1984, the Debtor contracted with Dr. Glick for the acquisition of Dr. Glick's 50% interest in the Westview Office. The agreement provided for monthly installment payments over a ten year period to Dr. Glick in full satisfaction of his interest in the Westview Office.

In 1986, the Debtor contracted for the construction of a medical office building at 3731 Guion Road in Indianapolis. This facility included four medical office units including a unit to be utilized by the Debtor for the continuing operation of the Westview Office. Upon completion of construction, the Westview Office was moved to 3731 Guion Road.

In 1986, Winona Memorial Hospital granted the Debtor surgical privileges and created an orthopaedic/podiatric clinic under the trade name "Step Lively Clinic". The Debtor and Dr. Frank Throop, an orthopaedic surgeon, provided podiatric and orthopaedic services, respectively, in conjunction with the initiation of clinic services.

In 1988, the Debtor and two other podiatrists, Anthony Miller and Elliot Kleinman, organized Indianapolis Podiatry, P.C., a professional medical corporation, engaged in the practice of podiatric medicine, each owning an equal number of shares of the corporation. Podiatry employs a number of podiatrists to work in offices in several cities in the State of Indiana.

Upon its formation, Podiatry assumed the contract payments to Dr. Glick and continued to make them until the contract expired in August of 1994.

Dr. Miller began providing podiatric services at the Step Lively Clinic in 1988; Dr. Kleinman began providing his podiatric services at the Clinic in 1992.

At its inception, each of Podiatry's principals executed employment agreements with Podiatry. Dr. Lundeen's contract, executed on December 30, 1987, and effective beginning January 1, 1988, was for a one year term and was automatically renewed for succeeding one year terms. Podiatry could terminate the contract for cause, including mutual agreement, the absence from employment by the Debtor for more than 90 days due to illness or any other incapacity, disability, refusal to comply with the policies, standards and policies of Podiatry, death or incompetency, economic losses, and willful misconduct, fraud or dishonesty. The Debtor could only terminate his contract with Podiatry after giving one year's notice and finding a suitable replacement. The Employment Contract includes a covenant not to compete whereby the Debtor agreed not to practice podiatry during the course of the agreement or for a two year period following the termination of the agreement in the geographic area serviced by Podiatry. The Debtor further agreed not to employ or solicit for employment the employees of Podiatry for the relevant two year period. A violation of the covenant not to compete resulted in liquidated damages.

On September 1, 1989, Podiatry entered into a "Professional Services Agreement" with Winona by which Winona retained Podiatry to operate and manage the Step Lively Clinic. The Agreement allowed Podiatry to retain 100% of the net patient revenue generated by the Clinic in exchange for annual rent of $15.37 per square foot for the 1,441 square foot facility. The Agreement was for a five year period, but could be terminated early under certain circumstances.

Winona expended thousands of dollars marketing the Step Lively Clinic from the inception of the Professional Services Agreement with Podiatry. In the spring of 1994,

Winona became concerned with certain fraud and abuse problems stemming from its marketing of the Step Lively Clinic. Winona was concerned that its marketing program could be perceived as offering financial incentives to doctors to bring business to the hospital which would be against the law. Winona therefore cut back on the advertising to focus more on the hospital services than on the doctors, and then eliminated the advertising in late spring or early summer. The elimination of the advertising resulted in a decline in the number of surgeries performed at Winona. Winona was also concerned that Podiatry was violating the non-compete provision of the Professional Services Agreement by operating a similar program at a competing hospital, Westview. For these reasons, Winona terminated the Professional Services Agreement with Podiatry in a letter dated August 1, 1994, effective immediately.

On August 3, 1994, Podiatry voted not to perform surgery at Winona after August 3, 1994. However, Podiatry agreed to continue to provide services to the patients that had been treated at the Step Lively Clinic.

On August 9, 1994, nine employees of Podiatry resigned their positions without prior notice.

On August 11, 1994, the Debtor filed his petition pursuant to Chapter 11 of the Bankruptcy Code. On this date, the Debtor asserted exclusive possession and control over the Westview Office by changing the locks and refusing admittance to other Podiatry officers. The nine employees of Podiatry who had resigned from Podiatry two days earlier began working for the Debtor on this date.

The Debtor was permitted to continue his podiatry practice by Winona at the Step Lively Clinic on and after August 1, 1994, without interruption. The Debtor also provided podiatric services at the Westview Office between August 1, 1994, and September 1, 1994. The Debtor's services during this time period were not rendered as an employee of Podiatry.

Simultaneously with the filing of his petition, the Debtor filed two motions. First, he filed a Motion to Reject his Employment Contract with Podiatry. Second, as the owner of the real estate at 3731 Guion Road, he filed a Motion for Approval of the Rejection of Real Property Lease by and between himself and Podiatry. Podiatry filed responses to the Motions and requested Court intervention to obtain possession of the Westview Office. In addition, Podiatry filed a claim for an alleged breach of the employment contract by the Debtor.

The Debtor and Podiatry began discussions immediately after the filing of the Debtor's petition. After protracted negotiations, the parties developed a Settlement Agreement on or about September 1, 1994. The parties presented an interim agreement to the Court at a hearing on September 1, 1994. The parties represented that a written accord would be prepared for the Court, and a final hearing on the agreement was set for September 26, 1994. The Court issued an Order approving the settlement on September 27, 1994. Under the terms of the Settlement Agreement, the parties agreed:

a) that the Debtor would relinquish exclusive possession of the Westview Clinic to Podiatry;

b) that the Debtor would relinquish to Podiatry the telephone number of the Westview Clinic;

c) that the Debtor would restrict his practice for one year to certain geographic limitations;

d) that Podiatry would provide to callers of the Westview Clinic number who mentioned the Debtor his new telephone number;

e) that the Debtor would be permitted to send notices to all of his patients informing them of his new location and telephone number;

f) that Podiatry could purchase the land and building where the Westview Clinic was situated for $540,000, closing to occur within 45 days of the Court's approval of the settlement agreement. If the sale did not occur, Podiatry would enter into a five year lease.

Following the Court's approval of the Settlement Agreement, the Debtor performed pursuant to the agreement. He relinquished

possession of the Westview Clinic and control of the Westview Clinic telephone number to Podiatry. He abided by the geographic restrictions in the agreement and sent notices to his patients informing them of his new address and telephone number. Podiatry did not close on the Westview real estate within 45 days, but it did remain in exclusive possession of the real estate. On October 2, 1995, the Westview real estate was transferred to the First National Bank in satisfaction of its lien. This transfer was made expressly subject to the lease rights of Podiatry under the Settlement Agreement.

Indianapolis Physician Services, Inc. is in the business of providing physician services to Winona. Indianapolis Physician Services provides medical services through physician employees practicing in primary and specialty care areas throughout Winona. On September 1, 1994, the Debtor executed a Clinic Podiatrist Employment Agreement with Indianapolis Physician Services. The Debtor's Employment Agreement with Indianapolis Physician Services contains many of the terms and conditions found in the Debtor's previous agreement with Podiatry. The Agreement with Indianapolis Physician Services provides for compensation to the Debtor in an amount equal to the greater of $15,000 per month or 50% of the fees actually collected by Indianapolis Physician Services which are attributable to the professional services actually rendered by the Debtor. In addition, there are provisions for a yearly bonus based on a percentage of the net income of Indianapolis Physician Services.

Podiatry subsequently became disenchanted with the Settlement Agreement with the Debtor and filed a Motion for Relief from Entry Authorizing Debtor to Settle Dispute. The Debtor countered with a Motion to Enforce Settlement Agreement. Following a hearing on November 16, 1995, the Court entered an Order on December 12, 1995, which denied Podiatry's Motion and allowed the Debtor's Motion. The Court concluded that the Settlement Agreement was not based on the fraud of the Debtor and his counsel or on a mutual mistake of the parties.

The parties agree that the practice of podiatric medicine is competitive and that podiatric medical practices are bought and sold. Prior to filing for bankruptcy, the Debtor, both alone and with others, had previously purchased, or participated in the purchase of at least two podiatric medical practices.

Podiatry spends thousands of dollars annually as part of its efforts to build and market its offices and its physicians. Covenants not to compete and restrictions on the use of patient names and records are regularly used in the podiatric industry to prevent employee physicians from leaving their employment and taking patients from their former employers. Podiatric practices are "portable", meaning that most of the patient base of a practice will follow their treating podiatrist to a new office location.

At the time of his bankruptcy filing, the Debtor was in charge of the Westview Office and treated 90% or more of the patients from that office. He was also in charge of the Step Lively Clinic at Winona and treated 90% or more of the patients at that location. Pursuant to the Settlement Agreement, the Debtor mailed letters to approximately 2,000 patients of the Westview Office and the Step Lively Clinic informing those patients of his new location at the Step Lively Clinic. The Debtor retained most of the patients at the Step Lively Clinic and significant numbers of Podiatry patients from the Clinic at the Westview Office followed the Debtor to Winona.

Podiatry has filed a request to include the goodwill of the Debtor's medical practice as an asset of the Debtor's Chapter 11 bankruptcy estate in light of the earnings exception of 11 U.S.C. § 541(a)(6). The relevant statutory provisions of § 541(a) are as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in

property as of the commencement of the case ...

\* \* \* \* \* \*

(6) Proceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

The Seventh Circuit recently addressed the goodwill issue in *In re Prince*, 85 F.3d 314 (7th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534, where a proceeding was brought to determine the value of the stock of the Chapter 11 debtor's orthodontics practice and to determine whether the goodwill of the practice was excluded from the bankruptcy estate under the earnings exception. The debtors, an orthodontist and his wife proposed the liquidation of their estate. As part of the reorganization plan, Dr. Prince was to retain his orthodontics practice, and he agreed to pay the equity value of it into a fund for the creditors of the estate. The debtors claimed that the equity value of the corporation was $7,500 based upon the value of the physical assets. The expert for the creditor's committee valued the corporation at $650,000 based on Dr. Prince's goodwill and the capitalization of the cash flow likely to be generated from the corporation in the future. The expert testified that the stock would have only nominal value without the personal goodwill of Dr. Prince. The Seventh Circuit found that the purchase price of $450,000 negotiated by Dr. Prince for the sale of his orthodontics practice to a Dr. Clare just four months after confirmation of the reorganization plan was an appropriate measure for determining the value of Dr. Prince's stock on the date of confirmation. *Id.* at 322. This, however, was not the end of the Seventh Circuit's inquiry. The court noted that pursuant to the earnings exception of § 541(a)(6), any portion of the stock's present value which was attributable to postcommencement earnings from Dr. Prince's services would not be part of the bankruptcy estate. The court explained its rationale as follows:

A good portion of the present value of the professional corporation's stock on the date of confirmation stems from the human capital of its sole employee on that date, Dr. Prince. Dr. Prince's services are valuable because of his various personal attributes, including his natural skills, his personality and demeanor, his extensive training and professional knowledge, and his license to practice dental medicine. By expending his labor in providing these services, Dr. Prince generated earnings for the practice, which resulted in profits flowing to the professional corporation's shares of stock. That portion of the stock's worth on the date of confirmation representing the value of Dr. Prince's future skilled labor is undisputedly excluded from the estate by virtue of the § 541(a)(6) postcommencement earnings exception.

However, not all of the stock's present value is attributable to Dr. Prince's future skilled labor, a fact evidenced by the sale agreement between Dr. Prince and Dr. Clare. The sale agreement price represents the value of the practice *over and above* the value of Dr. Prince's labors. To explain, after the consummation date of the sale, Dr. Prince was not expected to continue working for the practice; rather, Dr. Clare intended to substitute *his own* future skilled labor for that of Dr. Prince. Thus, after subtracting the amount of Dr. Clare's expenses and salary paid during the interim period by Dr. Prince, the purchase price presents the present value of the practice, excluding the worth of Dr. Prince's future labors—i.e., the present value of the corporation's physical assets and Dr. Prince's goodwill.

\* \* \* \* \* \*

... Dr. Prince's goodwill is unlike his skills, his schooling, or his dental license. These components of Dr. Prince's human capital can only manifest their value by increasing the worth of his future labors. Dr. Prince's innate physical ability, his personality, or his professional degree increase the market value of his services, but they cannot be sold to another orthodon-

tist; they have value only as attributes of Dr. Prince. On the other hand, Dr. Prince's goodwill, like the practice's physical equipment, can be sold and transferred, and once sold and transferred can generate value for another orthodontist. Although the mechanism of using his best efforts to transfer his patients' loyalties to Dr. Clare and then securing the transfer with a covenant not to compete is not as simple as signing over title to a physical asset, the functional effect is the same. Dr. Prince could sell and deliver his goodwill to Dr. Clare, and Dr. Clare would then reap the value of the asset. Thus, Dr. Prince's goodwill is not intrinsically part of his human capital, but rather is a separate intangible capital asset of the practice, like a trademark would be.

*Id.* at 322–23. (Footnotes omitted). Accordingly, the Seventh Circuit concluded that the value of earnings from future services performed by Dr. Prince should be excluded from the bankruptcy estate, but the value of Dr. Prince's goodwill must be paid into a fund for creditors pursuant to the plan of reorganization.

One of the cases cited with approval by the Seventh Circuit in *Prince* is *In re FitzSimmons*, 725 F.2d 1208 (9th Cir.1984). *Fitz-Simmons* involved an individual attorney operating a sole proprietorship which employed other attorneys as well as support staff. The debtor objected to paying any of his practice's future profits to his creditors in his Chapter 11 reorganization plan. The court agreed with the debtor that the earnings exception excluded from property of the estate all earnings generated by services "personally" performed by the debtor. However, the court further held that to the extent that the earnings of an attorney's law practice were not attributable to his personal services but rather to the invested capital, accounts receivable, goodwill, employment contracts with the firm's staff, client relationships or fee agreements, such earnings of the law practice accrued to the estate. *Id.* at 1211. The court reasoned that creditors should be entitled to enjoy the profits earned by a sole proprietorship just as they may suffer its losses. Accordingly, the court remanded the case to the bankruptcy court for a determination as to the portion of the debtor's postpetition earnings attributable to his personal efforts.

The *FitzSimmons* distinction between "personal" and "business" goodwill was criticized in *In re Cooley*, 87 B.R. 432 (Bankr. S.D.Tex.1988). *Cooley* involved the famous heart surgeon, Dr. Denton Cooley, who filed a voluntary Chapter 11 petition as a sole proprietor. The sole proprietorship generated substantial revenue. Dr. Cooley earned about half of the revenues of the business; five associate surgeons contributed to the balance of the revenues. Like the debtors in *Prince* and *FitzSimmons*, Dr. Cooley sought to exclude all postpetition earnings derived from the sole proprietorship. The *Cooley* court questioned the Ninth Circuit's effort to "interlineate" the term "personally" into the earnings exception. *Id.* at 439. The court noted that Congress was aware of the distinction between an individual debtor and a business organized as a sole proprietorship, but chose not to create separate debtor entities for an individual and his sole proprietorship. The court further noted that § 541(a) applied to all chapters of Title 11, to all debtors, and to voluntary and involuntary cases. Moreover, the court noted the intent of the earnings exception to protect a debtor's right to a fresh start and to protect debtors from the Thirteenth Amendment's prohibition against involuntary servitude. Once a debtor can show that he is an individual who performs postpetition services which generate earnings, *Cooley* found that the burden shifts to the creditor to show that an individual's earnings were proceeds, products, rents, or profits derived from assets or other property interest which had previously accrued to the estate under § 541(a). *Id.* at 441. The court concluded that Dr. Cooley's "personal goodwill is inextricably bound up with his personal services and is not by operation of the earnings exception property of the estate". *Id.* at 443. The court explained its rationale as follows:

It is difficult to view the goodwill attributable to the medical practice as anything but the personal goodwill of Dr. Cooley and to some degree the goodwill of the associate surgeons. Without the extensive

services and association of Dr. Cooley and to a lesser extent the associate surgeons, ... [the sole proprietorship] would possess little if any value beyond the value of the fixed assets ... Between the associate surgeons and Dr. Cooley it is apparent that their association with Dr. Cooley, and all such association entails in terms of his reputation, referral network, services and experience, remains dependent, if only by choice, upon the presence and personal goodwill of Dr. Cooley.

*Id.* at 443.

In contrast to *Prince, FitzSimmons,* and *Cooley, In re Herberman,* 122 B.R. 273 (Bankr.W.D.Tex.1990) interpreted § 541(a)(6) so that all earnings of any service-oriented business fell outside the earnings exception clause, except to the extent allowable to the debtor as salary under § 503(b)'s provisions for an administrative expense. The court concluded that Dr. Herberman's billings fell outside the earnings exception clause because they were not earnings from "proceeds, product, offspring, rents, and or profits". *Id.* at 278. The court determined that the earnings of a debtor-in-possession business were property of the estate under § 541(a)(7) as an "interest in property the estate acquires after the commencement of the case". *Id.* at 283. *Herberman* represents a minority view, and it has been the subject of much criticism. *See,* e.g., *In re Molina Y Vedia,* 150 B.R. 393, 397–402 (Bankr.S.D.Tex.1992). Moreover, it is not consistent with *Prince,* and will not be followed here.

 The facts in this case are clearly distinguishable from the facts in *Prince, FitzSimmons,* and *Cooley.* Unlike *Prince,* this case does not involve the value of a debtor's stock in a professional corporation or the distribution of proceeds from the sale of a business. The Debtor's stock in Podiatry is no longer property of the bankruptcy estate or the Debtor; it was surrendered to Podiatry as part of the Settlement Agreement after arm's length negotiations between the Debtor and Podiatry. Unlike *Prince, FitzSimmons,* and *Cooley,* the Debtor does not own a professional practice either as a corporation or as a sole proprietorship. He

does not employ other professionals as was the case in *FitzSimmons* and *Cooley.* The Debtor does not own a building or medical equipment which are of value in generating postpetition earnings. The Debtor is an employee of Indianapolis Physician Services, and his compensation is based on the services he performs. Indianapolis Physician Services provides the Debtor with the facilities, equipment, and support staff required to operate the Step Lively Clinic.

Pursuant to the Seventh Circuit's mandate in *Prince,* the value of earnings from future services performed by the Debtor are excluded from the bankruptcy estate, but the value of the Debtor's goodwill represented by future cash flows not from earnings for future services actually performed by the Debtor, i.e., the return on a capital asset that can be sold and transferred with the sale of the practice, is an asset of the bankruptcy estate. All the evidence before the Court in this case indicates that any goodwill is exclusively the personal goodwill of the Debtor. Any earnings generated by the Debtor are solely earnings attributable to the personal services of the Debtor after the commencement of the case. Any intangible capital asset that could be sold or transferred was transferred to Podiatry in the Settlement Agreement. There is no evidence which suggests that the Debtor could sell his employee relationship with Indianapolis Physician Services. The Debtor's compensation package with Indianapolis Physician Services is based on the services actually performed by the Debtor. Under these circumstances, the Court concludes that the goodwill of the Debtor's podiatric practice is not an asset of the bankruptcy estate.

For the foregoing reasons, Podiatry's request to include the goodwill of the Debtor's medical practice as an asset of the Debtor's bankruptcy estate is denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.