**In re Eric T. WEBER, Debtor.**

**Bankruptcy No. 94–42363–HJB.**

United States Bankruptcy Court, D. Massachusetts.

June 20, 1997.

Henry E. Geberth, Jr., Springfield, MA, for Debtor.

Kathleen R. Downing, Newton Center, MA, Chapter 11 Trustee.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is confirmation of the Second Amended Plan of Reorganization (the "Plan") filed by Eric T. Weber (the "Debtor"). The United States Trustee (the "UST") has filed an "Objection to the Debtor's Plan" (the "Objection"). The UST argues that the Plan was not proposed in good faith, a finding that is required for confirmation under 11 U.S.C. § 1129(a)(3). For the same reason, the UST has also filed a "Motion to Convert the Case to Chapter 7" pursuant to 11 U.S.C. § 1112(b) (the "Conversion Motion"). The UST contends that the Debtor's lack of good faith in proposing the Plan constitutes an unreasonable delay which is prejudicial to creditors; precludes the Debtor from ever being able to effectuate a plan; and constitutes "cause" for conversion.

### I. Facts

The Court makes the following findings under Fed.R.Bankr.P. 7052 as made applicable to contested matters by Fed.R.Bankr. 9014. Actually, most of the material facts are uncontested; however, what the facts mean in the case is the source of the dispute.

The Debtor filed a petition in this Court under Chapter 11 of the Bankruptcy Code on June 1, 1994. The Debtor is a physician employed by the North Shore Medical Center in Salem, Massachusetts as Director of the Radiation Oncology Department. That employment constitutes the sole source of the Debtor's income. In both 1994 and 1995, his annual salary was $242,000. The Debtor earned $252,000 in 1996. At the time the case commenced, the Debtor's reported material assets consisted of his interests in several real estate partnerships,[1] and nearly $700,000 in pension and retirement funds argued to be excludible from the estate pursuant to 11 U.S.C. § 541(c)(2).

The Debtor's financial difficulties stem primarily from several failed real estate ventures with respect to which the Debtor was a general, but passive, partner. However, the Debtor has not allowed these financial difficulties to adversely affect his lifestyle. The Debtor resides in a home in Weston, Massachusetts (the "Weston Property"), one of the wealthier of Boston's suburbs. The home is located along the golf course of the Weston Country Club. The Debtor conveyed his undivided one-half interest in the Weston Property to his wife in 1992 for no consideration. The Debtor claims that the Weston Property now has a fair market value of $528,000. The Debtor also has the benefit of a vacation residence on Cape Cod in East Dennis, Massachusetts (the "East Dennis Property"). The Debtor conveyed his undivided one-half interest in the East Dennis Property to his wife in 1990 for no consideration. The Debtor claims that the East Dennis Property now has a value of $293,000.[2] The Debtor continues to live in and pay all expenses associated with the Weston and East Dennis properties, totaling approximately $5,500 per month.

1. The Debtor claimed that these interests bore no equity for and represented a potential burden to the estate. Consequently, on April 26, 1995, the Court allowed the Debtor's motion to transfer his interest therein to his non-debtor partners.

2. Although the Debtor does not concede that the transfers of the Weston and the East Dennis properties constituted fraudulent transfers, recoverable by the estate pursuant to 11 U.S.C. § 544, the Debtor contends that the proposed dividend to creditors exceeds the combined equity of the properties. The UST did not seriously contest that assertion.

Furthermore, filing the Chapter 11 case in June of 1994 had little impact on the Debtor's travel plans. In the very same month that the Debtor filed the bankruptcy petition, he and his wife went on a two-week vacation to China. Other vacations during the pendency of the Chapter 11 case included Bermuda in December of 1994 (one week), Florida in March of 1995 (four days), Arizona and Utah in April of 1995 (one week), Switzerland in August of 1995 (three weeks), Vermont in September of 1995 (three days), and Bermuda in December of 1995 (one week). The Debtor estimated that he spent $15,498 on these seven vacation trips taken over 18 months. For each of these trips, the Debtor posited what he believed was a reasonable explanation. By way of example, he argued that his wife's expenses for the China trip were a gift to his wife by co-workers, and she could hardly go alone. The Bermuda trips were in lieu of Christmas holiday gifts. Other trips were made to celebrate important events in the lives of old friends. The Debtor testified that he attempted to reduce his expenses in each of these trips.

The foregoing were not all of the postpetition trips taken by the Debtor. The Debtor also attended five medical conventions, each for one week, in San Francisco (October of 1994), Aspen (January of 1995), Puerto Rico (February of 1995 & February of 1996), and Italy (Spring of 1996).[3] The Debtor's spouse accompanied him on each trip at the Debtor's expense. Although the Debtor was reimbursed by his employer for up to $6,000 annually for continuing medical education, the Debtor spent far in excess of his reimbursement allowance. For instance, 1995 credit card statements introduced into evidence revealed travel related purchases in Aspen and Puerto Rico combined of $8,300 (or $2,300 in excess of the Debtor's total reimbursement allowance for 1995). Moreover, the charges introduced were only those incurred to American Express, Visa, and MasterCard; they do not include expenses which the Debtor may have paid in cash or charged to other credit cards.

It is not only with respect to travel that the Debtor has lived well since the filing of the petition. According to the Debtor's monthly cash flow reports filed with the UST, in the 22 months from June of 1994 through September of 1996, the Debtor paid more than $17,000 to the Weston Golf Club where he remains a member, made approximately $90,000 in payments to credit card issuers,[4] gave approximately $3,200 to various charities, withdrew more than $16,000 from automatic teller machines, and wrote checks payable to his spouse in excess of $31,000 (exclusive of the mortgage payments he made on the houses that she owned after his transfers to her).

Confirmation of the Plan is not intended to alter the Debtor's current lifestyle. The Disclosure Statement sets forth the Debtor's projected postconfirmation *monthly* expenses as follows:

| | |
|---|---|
| Mortgage (Weston Property) | $2,612 |
| Mortgage (East Dennis Property) | $1,513 |
| Property taxes (East Dennis Property) | $ 262 |
| Utilities | $ 425 |
| Home maintenance/repairs | $ 459 |
| Food | $ 612 |
| Clothing | $ 450 |
| Laundry/dry cleaning/personal care products | $ 200 |
| Unreimbursed medical/dental | $ 130 |
| Gas, oil, repairs | $ 206 |
| Auto payments | $ 656 |
| Family expenses, newspapers, magazines, recreation, entertainment | $1,012 |
| Professional Associations meetings/Continued Education | $ 782 |
| Other unreimbursed travel | $ 800 |
| Life Insurance | $ 82 |
| Homeowner's insurance | $ 259 |
| Auto insurance | $ 322 |
| Professional/legal | $ 300 |
| Miscellaneous/other | $ 200 |

(Ex. B to the Disclosure Statement, Pl.'s Ex. 1). The Debtor has no dependents other than his spouse.

The Plan provides for a single class of creditors consisting of all general unsecured claims. These claims, resulting primarily from the Debtor's investments in the real estate partnerships, total approximately $2,500,000. The Plan proposes to pay the unsecured creditors $125,000 (approximately a 5% dividend) over five years. Plan payments will be made from the Debtor's future

---

**3.** Although the medical convention in Italy was set for only one week, the Debtor spent an additional week vacationing in Italy.

**4.** Granted, the Court may be guilty of some double-counting as the credit card payments include the travel expenses set forth above and possibly some payments to the Weston Golf Club.

797

earnings and will be secured by mortgages, granted by the Debtor's wife, on the Weston and East Dennis properties. Although Wellesley Cooperative Bank, which holds a mortgage on the Weston Property, failed to file a proof of claim and thus is not entitled to distribution under the Plan, the Debtor intends to continue making the monthly payments on the mortgage. Likewise, the Debtor intends to continue making the monthly payments to Cape Cod Cooperative Bank, which holds a mortgage on the East Dennis Property. Cape Cod Cooperative Bank agreed to waive distribution from the Plan on its claim.

All creditors voted to accept the Plan. After a nonevidentiary hearing on the UST's Objection, the Court scheduled an evidentiary hearing on confirmation. Subsequently, the UST's "Conversion Motion" was also scheduled for an evidentiary hearing on the same day. Upon conclusion of the evidentiary hearing, the Court took the matters under advisement.

## II. *Discussion*

Since the Supreme Court held in *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) that an individual debtor not engaged in business is eligible for Chapter 11 relief, bankruptcy courts have struggled to determine the standards for proper administration of such a case. *See, e.g., In re Bolton,* 188 B.R. 913 (Bankr.D.Vt.1995) (application of new value exception to absolute priority rule to individual debtors); *In re Rocha,* 179 B.R. 305 (Bankr.M.D.Fla.1995) (same); *In re Harp,* 166 B.R. 740 (Bankr. N.D.Ala.1993) (discussing application of 11 U.S.C. § 541(a)(6) in individual cases). The instant case presents the question of whether an individual Chapter 11 debtor's use of nonestate assets and/or allocation of future income to creditors may constitute factors in determining whether a debtor has demonstrated good faith in proposing a plan.

### A. The Good Faith Requirement of § 1129(a)(3)

■ Section § 1129(a)(3) requires that a plan have been "proposed in good faith and not by any means forbidden by law." Even where all creditors vote to accept a plan, the good faith requirement contained in § 1129(a)(3) must still be satisfied for the plan to be confirmed. *Crestar Bank v. Walker (In re Walker),* 165 B.R. 994, 1000–01 (E.D.Va.1994); *In re Egan,* 142 B.R. 730, 732 (Bankr.E.D.Pa.1992); 7 *Collier on Bankruptcy* § 1129.03[3][a] (15th ed. rev.1997); *see In re Noll,* 172 B.R. 122, 124 (Bankr.M.D.Fla. 1994) (requirement that plan must be proposed in good faith is mandatory and is condition precedent to confirmation).

■ Good faith is not defined in the Bankruptcy Code. It is often stated that "the term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code." *E.g., McCormick v. Banc One Leasing Corp. (In re McCormick),* 49 F.3d 1524, 1525 (11th Cir.1995); *Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.),* 939 F.2d 289, 292 (5th Cir.1991); *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1315 (8th Cir.1987); *In re Madison Hotel Assoc.,* 749 F.2d 410, 425 (7th Cir.1984); *In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir.1983). The plan "must be viewed in light of the totality of the circumstances surrounding confection of the plan." *Madison Hotel,* 749 F.2d at 425 (quoting *Jasik v. Conrad (In re Jasik),* 727 F.2d 1379, 1383 (5th Cir.1984)); *see McCormick,* 49 F.3d at 1525.

In applying this standard, courts have considered a wide variety of factors, such as whether the plan was proposed exclusively for tax considerations, *In re Maxim Indus., Inc.,* 22 B.R. 611 (Bankr.D.Mass.1982); whether the plan served only as a vehicle for the personal profit of the debtor's investors, *In re Rusty Jones,* 110 B.R. 362, 375 (Bankr. N.D.Ill.1990); and whether the plan was proposed by a competitor solely to drive the debtor out of business, *In re Unichem Corp.,* 72 B.R. 95, 100 (Bankr.N.D.Ill.), *aff'd,* 80 B.R. 448 (N.D.Ill.1987). With respect to individual debtors, all of the published decisions which discuss the application of § 1129(a)(3) consider a debtor's ability to pay in determining whether a plan was proposed in good faith. *Walker,* 165 B.R. 994; *Egan,* 142 B.R. 730; *In re Harman,* 141 B.R. 878 (Bankr.E.D.Pa.1992); *In re Kemp,* 134 B.R.

413 (Bankr.E.D.Cal.1991); *In re Fernandez*, 97 B.R. 262, 263 (Bankr.E.D.N.C.1989) (ability to pay is relevant factor in determining good faith consumer Chapter 11 case).[5]

■ The Debtor, however, argues that because postpetition wages are not property of the estate, he does not owe a fiduciary duty to the estate with respect to the disposition of those wages. It is true that 11 U.S.C. § 541(a)(6) specifically excludes from the bankruptcy estate earnings from services performed by an individual debtor after the commencement of the case[6] *But see Harp*, 166 B.R. 740 (excludes only those earnings for the debtor's services which are derived from products, proceeds, rents, or profits of property of the estate); *Herberman*, 122 B.R. 273 (same). However, the fact that a debtor's postpetition earnings are not property of the estate does not mean that the court is precluded from considering those earnings in connection with a determination of a debtor's good faith in proposing a plan.[7] On the contrary, all of the cases which address this issue hold that an individual debtor in Chapter 11 must make a sufficient financial commitment to creditors to satisfy the good faith requirement. *E.g., Walker*, 165 B.R. at 1001; *Egan*, 142 B.R. at 733–34; *Harman*, 141 B.R. at 889; *Kemp*, 134 B.R. at 415 (court noted debtor was capable of making payments substantially higher than was offered in the plan).

■ For example, the *Harman* court found, in the context of analyzing the application of the new value exception to the absolute priority rule in individual cases, that "a debtor's failure to make anything close to the best offer of payment to creditors violates § 1129(a)(3)." 141 B.R. at 889. Likewise, in *Walker*, the court observed that "the failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith...." 165 B.R. at 1001. Therefore, an individual debtor's conduct with respect to nonestate property is highly relevant to a determination of a debtor's good faith under § 1129(a)(3).

■ In order to demonstrate that a debtor has made its best effort to repay creditors, it is certainly appropriate to examine both the use of the debtor's resources during the administration of a Chapter 11 case *and* the debtor's projected use of those

**5.** Similarly, courts have also examined a debtor's ability to pay in the context of dismissal or conversion for lack of good faith. *E.g., In re Tejano*, 135 B.R. 686, 688 (Bankr.D.Kan.1991); *In re Devine*, 131 B.R. 952, 956 (Bankr.S.D.Tex.1991) (court considered debtors' budget and postpetition expenditures in analyzing whether debtors were fulfilling fiduciary duties); *In re Canion*, 129 B.R. 465, 470 (Bankr.S.D.Tex.1989) (debtor's personal expenditures, which were found to be far in excess of what was reasonable or necessary, factored into court's decision to convert case). In *Tejano*, the court observed that if an individual without a business is to file a Chapter 11 case, and reorganization rather than liquidation of assets is the goal, then the debtor must devote his or her income to that goal. 135 B.R. at 688.

**6.** Section 541(a)(6) is problematic when an individual debtor is a sole proprietor. Courts have reached different conclusions as to the extent to which an individual Chapter 11 debtor's earnings from a sole proprietorship are excluded from the estate. Some courts divide the earnings based on how the income was generated. Thus, earnings generated from the debtor's services are not included in the estate, while earnings attributable to invested capital, accounts receivable, and the like are property of the estate. *See, e.g., In re Prince*, 85 F.3d 314 (7th Cir.1996); *FitzSim-*

*mons v. Walsh (In re FitzSimmons)*, 725 F.2d 1208 (9th Cir.1984); *Altchek v. Altchek (In re Altchek)*, 124 B.R. 944 (Bankr.S.D.N.Y.1991); *In re Cooley*, 87 B.R. 432 (Bankr.S.D.Tex.1988); *see also In re Lundeen*, 207 B.R. 604 (Bankr.S.D.Ind. 1997). Other courts have found that all postpetition earnings by an individual debtor are excluded from the estate. *E.g., In re Molina Y Vedia*, 150 B.R. 393 (Bankr.S.D.Tex.1992); *Fernandez*, 97 B.R. 262. Still other courts interpret § 541(a)(6) very narrowly to exclude from the estate only those earnings which are derived from products, proceeds, rents, or profits of property of the estate. *Harp*, 166 B.R. 740; *In re Herberman*, 122 B.R. 273 (Bankr.W.D.Tex.1990).

In the instant case, the Court need not opine on this split of opinion as the Debtor does not have an ownership interest in his employer.

**7.** In practical reality, individual debtors will generally need to utilize some portion of the very postpetition earnings which are excluded from the estate in order to fund a confirmable plan of reorganization. *See In re Keenan*, 195 B.R. 236, 242–43 (Bankr.W.D.N.Y.1996) (where there will be almost no funds with which to finance plan without individual debtor's postpetition earnings, conversion or dismissal may be appropriate); *In re Powell*, 187 B.R. 642, 647 (Bankr.D.Minn. 1995) (same); *Altchek*, 124 B.R. at 956 (same).

resources after confirmation of the debtor's plan. The difficulty lies in determining how to measure whether a financial commitment is sufficient. One obvious analogy is the disposable income test used in Chapter 13 cases. *See Egan*, 142 B.R. at 733–34. However, in this context the Court views that test with some hesitation. Chapter 13 is different from Chapter 11 in several important respects. For instance, although the Chapter 13 debtor is required to commit all disposable income to the plan, that debtor, unlike a Chapter 11 debtor, may dismiss the case at any time. In addition, there are no involuntary Chapter 13 proceedings, and more importantly, creditors are not allowed to vote on the plan. Nevertheless, the Court finds disconcerting the notion that a debtor who is unable to qualify for Chapter 13 relief because his or her liabilities exceed the debt limits may receive more favorable treatment in Chapter 11 than a debtor in Chapter 13 who has fewer debts. *See Canion*, 129 B.R. at 469. As a result, this Court believes that the disposable income test, while it cannot constitute a bright line for determining good faith in all individual Chapter 11 cases, is useful as a guideline to determine whether a debtor has committed sufficient available resources to a plan.

 In the instant case, the Debtor maintains two homes and travels extensively. Even though he has no dependents other than his wife, his monthly budget is extravagant including $1,012 for newspapers, recreation and entertainment, $800 for travel not reimbursed by his employer, and $782 for professional associations meetings/continued education.[8] Without deciding what expenses must be eliminated or reduced, the Court notes that the Debtor's needs could be well satisfied by eliminating or, at the very least, reducing vacations, travel expenses in excess of his reimbursement allowance, or the golf club membership. Additional savings could be achieved by reducing the Debtor's excessive expenses for recreation and entertainment. Likewise, by selling the vacation home in West Dennis, the Debtor could save

yearly expenses of at least $21,300. Such belt-tightening could more than double the Debtor's proposed payments to creditors.

In contrast, the Debtor argues that his use of his postpetition income was and is in good faith. The following exchange at trial between counsel to the UST and the Debtor is indicative of a significant difference in perspective:

MS. DOWNING (Counsel to the UST): Do you think it's fair to creditors that you take all these trips when you have so much debt that's owed?

DEBTOR: I hadn't thought it was unfair.

MS. DOWNING: Dr. Weber, have you ever thought about the concept of tightening your belt in order to pay your creditors?

DEBTOR: I think there are things we have not done, hard as it may seem to you, that we might have done if I weren't in this situation.

The Debtor's preceding answer was fully responsive to the UST's inquiry. It reflected the Debtor's complete insensitivity to his circumstances.

In his Post–Trial Memorandum in Support of Confirmation of the Plan, the Debtor further explains "[i]f the Court considers the Debtor's position in life, the daily stress of his position dealing only with cancer patients and his contributions to his community, the Debtor's postpetition activities ... take on a new meaning." (Debtor's Post–Trial Mem. at 8.) The Debtor then rhetorically asks with unmitigated temerity:

Is it grandiose or flamboyant living to take part in a cultural exchange to China as the guest of one's spouse, who had earned this honor? Is it improper to spend Christmas in Bermuda with [the Debtor's] family, living in a housekeeping cottage, the family cooking their own meals with food brought predominantly from home when this is done in lieu of the family exchanging presents over a period of years? Is it totally inappropriate to celebrate a close friend's

---

**8.** It is unclear how this figure is related to the Debtor's $6,000 annual reimbursement from his employer for these expenses. Even if the $6,000 reimbursement is subtracted from the budgeted amount, the Debtor still anticipates spending an

additional $3,384 per year for professional associations meetings/continued education. This in itself is excessive, particularly in light of the extra $9,600 the Debtor budgets annually for other unreimbursed travel.

65th birthday in Florida, to attend the wedding of a close friend's son in Vermont or to visit old Boston friends who moved to Arizona?

(Debtor's Post–Trial Mem. at 8.) The Court's answer to these questions is a resounding "yes." A debtor cannot file a Chapter 11 petition and claim an entitlement to live in the style to which he or she has become accustomed.

The Debtor further urges that "[t]he debtor's lifestyle should not reasonably be construed as offending the integrity of the system." (Debtor's Post Trial Mem. at 8.) "The record is clear that post-petition trips were not extravagant." (Debtor's Post Trial Mem. at 11.) "Nor are there suggestions of a lifestyle that would be shocking to the court or worse, conduct which would send the wrong message to the public." (Debtor's Post Trial Mem. at 11.) The Court finds these statements preposterous. The record could not be more clear that the trips were extravagant in light of the Debtor's bankruptcy, that the Debtor's lifestyle was unreasonable, and that the Debtor's conduct both offends the integrity of the system and sends a wrong message to the public. The message that this Debtor's Plan and conduct send is that an individual may file a Chapter 11 petition and continue to live in luxury while paying a relative pittance to creditors. The purpose of the Bankruptcy Code is to provide the debtor with a fresh start, not to preserve a debtor's extravagant lifestyle. *See In re Belco Vending, Inc.*, 67 B.R. 234, 240 (Bankr.D.Mass.1986).

A plan in which the Debtor retains 100 percent of the expenditure necessary to support a lavish lifestyle, while proposing to pay a 5 percent dividend to creditors is not proposed in good faith. *See Harman*, 141 B.R. at 889. Accordingly, the Debtor has not met the § 1129(a)(3) good faith requirement.[9]

## B. Appropriate Remedy When a Plan Fails to Meet the Good Faith Requirement

Now that the Court has held that the Debtor's Plan cannot be confirmed, the remaining issue is how the case should proceed. Before the Court is the UST's Conversion Motion. However, there are two other alternatives: the Court could allow the Debtor to amend the Plan, or the Court could dismiss the case sua sponte [10] as a bad faith filing.

In determining the appropriate remedy, the Court must ascertain whether the Debtor's conduct during the pendency of the case constitutes an unreasonable delay which is prejudicial to creditors; precludes the Debtor from ever being able to effectuate a plan; or rises to a level of bad faith which prohibits the Debtor from amending the Plan, and thus warrants conversion or dismissal of the case.

▮▮▮ Lack of good faith constitutes cause for dismissal or conversion pursuant to § 1112(b). *E.g., Carolin Corp. v. Miller*, 886 F.2d 693, 699 (4th Cir.1989); *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir.1986); *Madison Hotel*, 749 F.2d at 426; *PACCAR Fin. Corp. v. Pappas (In re Pappas)*, 17 B.R. 662, 666 (Bankr. D.Mass.1982); *see In re Victory Constr. Co., Inc.*, 9 B.R. 549 (Bankr.C.D.Cal.1981) (contains thorough discussion of the historical

---

**9.** The UST also argues that the Court should find that the Debtor's intention, stated at trial, to pay the monthly mortgage payments to Wellesley Cooperative Bank and Cape Cod Cooperative Bank in full is indicative of the Debtor's lack of good faith because the Debtor proposes to treat those creditors (unsecured to him) differently from other unsecured creditors under the Plan. The record before the Court is insufficient to justify such a finding. The Debtor did not obligate himself to make such payments in the Plan. Therefore, those payments could be characterized as voluntary. *See* 11 U.S.C. § 524(f). Alternatively, such payments could be characterized as ongoing postpetition support obligations to which the Debtor's wife might be entitled. In order to

characterize the payments themselves as improper, more would need to be shown.

**10.** Sua sponte dismissals have been sanctioned by a variety of courts. *E.g., In re Finney*, 992 F.2d 43, 45 (4th Cir.1993); *In re Argus Group 1700. Inc.*, 206 B.R. 757, 763 (E.D.Pa.1997); *Jablonski. v. Internal Revenue Service*, 204 B.R. 456, 459 (W.D.Pa.1996); *In re 183 Lorraine St. Assoc.*, 198 B.R. 16, 32 (E.D.N.Y.1996); *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828, 831 (W.D.Ky.1992); *In re Harvey Probber, Inc.*, 44 B.R. 647, 651–52 (Bankr. D.Mass.1984); *see* 7 *Collier on Bankruptcy* § 1112.04[9][b] (15th ed. rev.1997).

development of the good faith requirement). However, the good faith standards under § 1112(b) and the good faith requirement in § 1129(a)(3) are different. *See Madison,* 749 F.2d at 425 (distinguishes between good faith under § 1129(a)(3) and good faith as a prerequisite to filing a chapter 11 petition); *Victory Constr.,* 9 B.R. at 551. While § 1129(a)(3) focuses on the debtor's plan of reorganization, the good faith standard under § 1112(b) focuses on the subjective intentions of the debtor in conjunction with all of the facts and circumstances of the case. *See Little Creek,* 779 F.2d at 1074, 7 *Collier on Bankruptcy* § 1112.07[1] (15th ed. rev.1997). Still, like § 1129(a)(3), the good faith requirement pursuant to § 1112(b) attempts to prevent abuse of the provisions, purpose, or spirit of the Bankruptcy Code. *See Carolin Corp.,* 886 F.2d at 698; *Little Creek,* 779 F.2d at 1072; *In re Rognstad,* 121 B.R. 45, 50 (Bankr.D.Haw.1990). To protect against dismissal or conversion pursuant to § 1112(b), a debtor must exhibit good faith at each stage of a bankruptcy case: in its commencement, during its prosecution, and at confirmation. *Little Creek,* 779 F.2d at 1071. *Contra In re Victoria Ltd. Partnership,* 187 B.R. 54 (Bankr.D.Mass.1995) (rejects the good faith filing doctrine).

■ A debtor who comes to a court of equity seeking equity must be prepared to do equity. In *Tejano,* the court concluded that a debtor's plan provided evidence of the debtor's intent in the filing of the Chapter 11 case. 135 B.R. at 687. By examining the debtor's plan, the court determined that the debtor did not intend to reorganize, but rather intended to retain his standard of living, while eliminating debts he did not want to pay. *Id.* at 687–89. As a result, the court concluded that the debtor filed the case in bad faith and that dismissal was appropriate. *Id.* at 689. Similarly, although the court in *Devine* held that the debtor's unbridled use of cash during the case did not warrant dismissal, the court issued an order to show cause why the case should not be converted to Chapter 7 or why a Chapter 11 trustee should not be appointed. 131 B.R. at 957. In contrast, even though the courts in *Walker* and *Harman* held that the plans in those cases were proposed in bad faith, both courts allowed the debtors an opportunity to file amended plans. *Walker,* 165 B.R. at 1005; *Harman,* 141 B.R. at 889.

■ The Debtor filed the instant case in 1994. During the interim, he has failed to, in good faith, prosecute his reorganization effort. Nevertheless, it seems to be in the best interests of creditors to allow the Debtor to amend the Plan. Conversion may result in no distribution to creditors since the Debtor claims to have no prepetition assets constituting property of the estate. In addition, although dismissal will allow the creditors to continue to seek payment, the Debtor may be tempted to file another bankruptcy case. It makes more sense to give the Debtor an opportunity to overcome his self-inflicted postpetition problems, if possible. This Court is not yet prepared to say that the Debtor's conduct rises to such a level of bad faith that his reorganization effort is irretrievable.

Accordingly, the Court will allow the Debtor an additional 30 days to file an amended plan and the Conversion Motion will be denied without prejudice. However, the Court wishes to be very clear that its tolerance for the Debtor's conduct is nearly exhausted. This will be the Debtor's final opportunity to propose a plan in good faith. If a confirmable plan is not filed in accordance with the Order issued in conformity with this Memorandum, the Court will order the Debtor to show cause why the case should not be converted or dismissed pursuant to § 1112(b).